[Cite as *Tera, L.L.C. v. Rice Drilling D., L.L.C.*, 2023-Ohio-273.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## BELMONT COUNTY

TERA, LLC,

Plaintiff-Appellee,

v.

RICE DRILLING D, LLC ET AL.,

Defendants-Appellants.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 21 BE 0047**

---

Civil Appeal from the
Court of Common Pleas of Belmont County, Ohio
Case No. 17 CV 344

**BEFORE:**
David A. D'Apolito, Gene Donofrio, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed in part. Reversed and Vacated in part.

---

*Atty. Charles H. Bean,* Thornburg & Bean, 113 West Main Street, P.O. Box 96, St. Clairsville, Ohio 43950, *Atty. Elizabeth L. Glick*, Law Office of Elizabeth L. Glick, P.O. Box 191, St. Clairsville, Ohio 43950*, Atty. Richard A. Myser*, Myser & Davies, 320 Howard Street, Bridgeport, Ohio 43912, and *Atty. Craig J. Wilson*, C.J. Wilson Law, LLC, 2606 Hilliard Rome Road, PMB 3007, Hilliard, Ohio 43026, for Plaintiff-Appellee and

*Atty. John Kevin West,* and *Atty. John C. Ferrell*, Steptoe & Johnson PLLC, 41 South High Street, Suite 2200, Columbus, Ohio 43215, and *Atty. Melanie M. Norris*, Steptoe & Johnson PLLC, 1233 Main Street, Suite 3000, P.O. Box 751, Wheeling, West Virginia 26003, for Defendants-Appellants Rice Drilling D, LLC and Gulfport Energy Corporation.

*Atty. Anna G. Rotman*, and *Atty. Kenneth A. Young*, Kirkland & Ellis, LLP, 609 Main, Suite 4600, Houston, Texas 77002, for Defendant-Appellant Rice Drilling D, LLC.

Dated:  January 18, 2023

**D'Apolito, P.J.**

{¶1}    Appellants, Rice Drilling D, LLC ("Rice Drilling")[1] and Gulfport Energy Corporation ("Gulfport Energy"), Rice's working interest partner in six horizontal oil and gas wells in pooled units in Belmont County, Ohio (collectively "oil and gas companies"), appeal five judgment entries of the Belmont County Court of Common Pleas in this action by Tera, LLC ("Tera")[2] for willful trespass and conversion.[3]  On June 3, 2020, on cross-motions for summary judgment, the trial court entered partial summary judgment in favor of Tera and against the oil and gas companies on Tera's claims for trespass and conversion. The trial court opined that the unambiguous language in the leases executed between Rice Drilling and Tera's predecessor-in-interest and Tera's sole member,

---

[1] Rice Drilling D, LLC was a wholly-owned subsidiary of Rice Energy Inc. ("Rice Energy"), and is currently a wholly-owned subsidiary of EQT Corporation.

[2] Tera, LLC is one of several Tera entities, which leased subsurface rights in property located in Belmont County.  The members of the other Tera entities are Thomas Shaw and one or more of his three daughters.

[3] The original complaint was filed on October 11, 2017.  The First Amended Complaint was filed on July 11, 2018, and was amended by way of a motion to amend by interlineation filed on December 11, 2019.  The motion to amend by interlineation related exclusively to the breach of contract claim predicated upon the oil and gas companies' alleged failure to pay royalties to Tera, which is asserted in count six of the First Amended Complaint.

In the first five counts of the First Amended Complaint and the tenth and final count, Tera asserted a quiet title action against several individual defendants in order to establish ownership of the mineral rights at issue in this appeal, predicated upon the alleged expiration, extinguishment, and/or abandonment of a prior, severed interest.  The tenth count relates to the recovery of improper royalty payments. On September 23, 2019, the trial court entered partial summary judgment in favor of Tera on counts one through five of the First Amended Complaint. The individual defendants did not appeal the September 23rd judgment entry.

The remaining four counts of the First Amended Complaint state claims against the oil and gas companies for breach of contract, predicated upon the failure to pay royalties (count six - interlineated); intentional subsurface trespass and conversion (counts seven and eight); and unjust enrichment (count nine).

Thomas Shaw ("Shaw") reserves the subsurface rights to the Point Pleasant to the surface owner.

{¶2} On October 2, 2020, on cross-motions for summary judgment, the trial court entered partial summary judgment in favor of Tera and against the oil and gas companies on the issue of bad faith trespass. The trial court's entry of summary judgment on bad faith trespass is predicated upon the trial court's previous conclusion that the unambiguous language in the leases reserves the subsurface rights in the Point Pleasant to the surface owner.

{¶3} In a judgment entry issued on July 1, 2021, five days prior to the commencement of the jury trial on damages, the trial court imposed a discovery sanction on the oil and gas companies, which prohibited them from introducing evidence about the actual quantity of gas produced from the wells at issue or the actual price at which the gas sold. The July 1, 2021 judgment entry further prohibited the oil and gas companies from offering expert testimony or challenging the expert testimony offered by Tera based on "information [the oil and gas companies] had but did not provide to [Tera.]" As a consequence, the jury relied on actual production, rather than actual sales, to calculate damages. In the absence of evidence of actual sales, the trial court's sanction further allowed Tera's expert to calculate damages based on the price set by the New York Mercantile Index ("NYMEX"), which is set at the Henry Hub in Louisiana, rather than local indices, which are based on the price of natural gas in the Appalachian basin.

{¶4} On July 9, 2021, following the jury trial, the trial court issued a judgment on the verdict awarding total net damages in the amount of $40,129,357.62 ($42,129,916.62 minus $2,000,559.00 for royalties paid during the course of the leases) to Tera on the bad faith trespass claim. Finally, on October 21, 2021, the trial court overruled the oil and gas companies' motion for judgment notwithstanding the verdict ("JNOV") and for remittitur, which is predicated upon a series of evidentiary arguments that Tera failed to prove both the existence of damages to a reasonable scientific certainty, and the amount of damages actually incurred by Tera.

{¶5} In this appeal, the oil and gas companies advance six assignments of error. First, they assert that the trial court should have considered extrinsic evidence when interpreting the relevant provisions of the leases, because circumstances surrounding the

agreement give the plain language special meaning, and/or the language in the oil and gas leases is ambiguous. Second, the oil and gas companies argue that the trial court erred in its conclusion that the oil and gas companies engaged in bad faith trespass. In their third and fourth assignments of error, the oil and gas companies assert that the trial court abused its discretion when it failed to properly instruct the jury on the computation of damages, and when it denied the motion for JNOV, despite the fact that Tera failed to prove its damages to a reasonable degree of certainty. They further argue that the trial court erred as a matter of law when it refused to admit testimony establishing that Tera did not own a portion of the property during the timeframe for which Tera was awarded damages. Fifth, the oil and gas companies argue that the trial court erred as a matter of law when it allowed the jury to apply a multiplier to its award of actual damages, to bring the damages award to its present value. The oil and gas companies characterize the application of the pv-10 multiplier to the jury's actual damages award as prejudgment interest, which they assert is not within the province of the jury in Ohio. Finally, the oil and gas companies argue that the trial court abused its discretion in excluding their evidence regarding the quantity of damages, and restricting their ability to cross-examine Tera's damages expert, as a sanction for their failure to timely produce sales information.

{¶6} For the following reasons, the trial court's entries of summary judgment in favor of Tera on its bad faith trespass claim are affirmed. We further find that the trial court did not abuse its discretion when it excluded evidence of actual sales at trial based on the record. Next, we find that there exists substantial evidence in the record supporting the jury's award of both actual and future damages. We likewise affirm the jury's application of the pv-10 multiplier to the actual damages award in this case, as we conclude that it does not constitute an award of prejudgment interest. However, we reverse the amount of the compensatory damages award because it includes damages incurred while Shaw, not Tera, was the record owner of the surface. Accordingly, we affirm the judgment on the verdict with respect to Tera's entitlement to future damages and the amount of future damages, Tera's entitlement to compensatory damages, and the percentages attributable to the oil and gas companies. We reverse and vacate the judgment on the verdict in part and remand this matter for a jury trial limited solely to the amount of compensatory damages sustained by Tera.

Case No. 21 BE 0047

## FACTS AND PROCEDURAL HISTORY

{¶7}   On December 31, 2013, Shaw entered into the first oil and gas lease with Rice Drilling at issue in this appeal.  Shaw and Rice Drilling entered into the second lease at issue here on August 13, 2014.  The leases are identical but for the property descriptions.

{¶8}   The two leases govern the oil and gas companies' rights to the subsurface minerals in approximately 271 acres of property in Belmont County, Ohio. In 2016, a 31.31-percent interest in the leases was assigned from Rice Drilling to Gulfport Energy. Tera's property is included in three pooled units:

> 147.22 acres of Tera's property are in the Gold Digger Unit.  There are two horizontal wells in the Gold Digger Unit:  the Gold Digger 1 well and the Gold Digger 3 well.  Tera's property constitutes 38.140217% of this unit.

> 2.76 acres of Tera's property are in the Son Uva Digger Unit.  There are three wells in the Son Uva Digger Unit:  the Son Uva Digger 1 well, the Son Uva Digger 3 well, and the Son Uva Digger 5A well.  Tera's property constitutes .395271% of this unit.

> 0.09 acres of Tera's property are in the Gold Digger South 3 Unit.  There is one well in the Gold Digger South 3 Unit, being the Gold Digger 6 well. Tera's property constitutes .03541681% of this unit.

(Joint Stipulation of Facts, ¶ 6.) Each of the wells began production in early 2015, with the exception of the Gold Digger 6, which began production in December of 2017.

{¶9}   Article One of the leases, captioned "GRANT OF LEASE," reads, in pertinent part:

> Lessor, in consideration of the payments described herein and the covenants and agreements hereafter contained, hereby leases and lets exclusively to the Lessee all the oil, gas, minerals and their constituents (not including coal) **in the formations commonly known as the Marcellus**

**Shale and the Utica Shale**, underlying the land described below for the sole purpose of exploring for, drilling, operating, producing and gathering the oil, gas, casinghead gasoline and all other gases and their respective vapors, liquid or gaseous hydrocarbons produced in association therewith **other than as reserved unto Lessor below.**

(Emphasis added)(Plaintiff's Trial Exhibit No. 1, p. 1.)

{¶10}  The reservations section within Article One in each lease reads, in pertinent part:

The Lessor reserves all rights not specifically granted to Lessee in this Lease.  Lessor specifically reserves the right to all products contained in any formation:  (1) from the surface of the Leased Premises to the top of the formation commonly known as Marcellus Shale, (2) in any and all formations below the base of Marcellus Shale to the top of the formation commonly known as Utica Shale, and **(3) in all formations below the base of the Utica Shale.**

(Emphasis added)(*Id.*, p. 2.)

{¶11}  Although initially a matter of dispute, the geological expert retained by the oil and gas companies later conceded that each of the six wells are landed in the Point Pleasant.  There is also no dispute that the parties to the leases did not engage in any negotiation regarding the Point Pleasant and that the Point Pleasant was never even mentioned during the lease negotiations.

{¶12}  Tera contends that the Point Pleasant is a distinct geological formation from "the formation[ ] commonly known as the Utica Shale," and that Tera is the sole owner of the Point Pleasant, based on Shaw's express reservation of "all formations below the base of the Utica Shale" in the lease.  The oil and gas companies concede that the Utica Shale and the Point Pleasant are separate rock units. However, they assert that Point Pleasant is an interval contained within what was, in December of 2013 and August of

2014, when the leases were executed, "the formation commonly known as the Utica Shale."

{¶13} Discovery disputes plagued the second part of the pre-trial process relating to Tera's claims against the oil and gas companies. Relevant to this appeal, Tera's first motion to compel was filed on January 28, 2019 and related to its second and third requests for interrogatories and production of documents to Rice Drilling. The motion was sustained on October 4, 2019. The oil and gas companies were ordered to produce the requested discovery by November 18, 2019 or show cause for their failure to respond. The show cause hearing was continued several times as Tera continued to dispute the oil and gas companies' alleged compliance with the October 4, 2019 judgment entry. The show cause hearing was ultimately held on January 27, 2020, but no hearing transcript was filed and no judgment entry was issued.

{¶14} Tera's second motion to compel was filed on March 3, 2020 and related to its first request for interrogatories and production of documents to Gulfport and its fifth request to Rice Drilling. Rice Drilling had previously filed a motion for protective order on January 3, 2020 relating to Tera's fifth request, in which it argued that information regarding Rice Drilling's calculation of royalties was not relevant to Tera's claims.

{¶15} According to the second motion to compel, Tera sought information relating to Rice Drilling's calculation of royalties, based on the royalties claim asserted in count six of the First Amended Complaint. The motion reads in pertinent part:

> In prior document requests, Rice [Drilling] has indicated it sells gas to five sales points. In [requests for production #7-11], [Tera] is seeking the gross sales price and volume of gas sold by each of these five sales points each month. Given [Tera's] amended Count VI claim for breach of contract for improperly deducting costs, this Request is directly relevant to the calculation of [Tera's] royalty.

(3/3/20 Mot. To Compel, p. 8-9.) The interrogatories and requests for production of documents likewise sought the weighted-average sales price for all gas sold by Rice Drilling or an affiliate thereof to all sales points without any deduction for costs and the gross proceeds received.

Case No. 21 BE 0047

**{¶16}** Oral argument on pending motions was heard on March 9, 2020. According to the transcript of the March 9, 2020 hearing, the trial court denied Rice Drilling's motion for protective order at the January 27, 2020 hearing, and ordered Rice Drilling to produce the requested discovery by February 24, 2020. There is no judgment entry in the record overruling the motion for protective order.

**{¶17}** With respect to the original motion to compel, for which a motion for sanctions was still pending, Tera identified three discovery requests which had yet to be fulfilled – microseismic data, information regarding well costs, and documents relating to Rice Drilling's understanding of the Point Pleasant. Tera referred to a pleading filed with the trial court that same day, which provided a summary of the continuing discovery disputes, but no such pleading appears on the docket. At the conclusion of the hearing, the trial court took all matters under advisement. No judgment entry was issued.

**{¶18}** The Rice Drilling portion of this action was originally set for a bench trial on April 4, 2019, with a discovery deadline of January 1, 2019. During the pendency of the trial court action, the trial was continued to October 1, 2019, March 10, 2020, July 28, 2020, October 5, 2020, December 15, 2020, May 11, 2021, and ultimately July 6, 2021.

**{¶19}** On July 13, 2020, with a pending trial date of July 28, 2020 on the docket, Tera filed an omnibus motion in limine to exclude evidence that the oil and gas companies had allegedly failed to produce during discovery. The following day, the oil and gas companies filed a motion to extend deadlines and continue the trial.

**{¶20}** It is important to note that the first judgment entry reflecting the new trial date of October 5, 2020 was filed on September 4, 2020. However, the judgment entry begins, "[a]s previously announced." Consequently, it is not clear from the record whether the trial date was verbally continued before or after the omnibus motion in limine was filed.

**{¶21}** The relevant portion of the omnibus motion in limine reads that the oil and gas companies produced sales information between June 24, 2020 and July 2, 2020, after the close of discovery on March 27, 2020. Tera argues that "in lieu of producing actual documents and data, [the oil and gas companies] produced certain summary spreadsheets showing a gas price and revenue, but refused to provide the underlying contracts to verify the accuracy or determine how the price is actually being calculated."

(Mot., p. 14.) Because the spreadsheets were produced after Tera's expert completed his report, Tera argued that its expert "should not be required to use unverified summary sales data and [the oil and gas companies] should not be able to object to [Tera's] use of an index price." (*Id.*, p. 15.)

**{¶22}** The oil and gas companies countered that the sales data requested by Tera had been previously produced in the royalty statements "which [Tera] ha[d] received since the six wells were placed in production." (8/3/2020 Response Brf., p. 12.) The oil and gas companies further asserted, in addition to the spreadsheet, many additional documents produced during discovery illustrate the sales prices of the gas produced from the six wells. (*Id.*, citing Bates' stamp numbers for documents). In the response brief, the oil and gas companies objected to Tera's intended use of the NYMEX price to calculate the value of the gas previously sold.

**{¶23}** On August 10, 2020, Tera filed a motion for oral argument on all outstanding motions. On September 4, 2020, the trial court issued a judgment entry scheduling a hearing on September 14, 2020, at which the trial court represented that it would "hear and then immediately decide all of the pending motions." The hearing was held on September 14, 2020. No transcript was filed.

**{¶24}** Evidently, the trial court did not resolve the pending discovery issues as Tera filed a memorandum concerning the oil and gas companies' incomplete discovery production on September 23, 2020. The oil and gas companies filed a memorandum in response, in which they averred that "Rice [Drilling] has produced all gas sales agreements and documents regarding its sale of gas from [Tera's] wells and in eastern Ohio." (9/28/20 Memorandum, p. 2.) The memorandum contains a list of Bates' stamp numbers and a summary of their content.

**{¶25}** On September 23, 2020, Tera filed a second motion in limine seeking to exclude the testimony of several of the oil and gas companies' witnesses. A hearing on the motion was held on September 25, 2020. No hearing transcript was filed. However, in an October 1, 2020 journal entry, the trial court explained that the oil and gas companies only intended to offer the testimony of one of the named witnesses, Toby Rice. The journal entry further reads:

[Tera's] counsel advised of his recent filing addressing [the oil and gas companies'] alleged incomplete discovery responses/production. [The oil and gas companies'] counsel stated that a response would be forthcoming. The Court will then address [Tera's] Motion in Limine directed to the consequence for [the oil and gas companies'] alleged incomplete responses/production.

(10/1/20 J.E., p. 1.)

{¶26} In a journal entry dated October 2, 2020, the trial court granted leave for Tera to file "the Judgment Journal Entry corresponding to the September 14, 2020 hearing." The entry was never filed. Further, the trial court scheduled a hearing on all remaining pending motions for October 5, 2020. The journal entry concludes, "[i]n addition to all of the listed matters, the Court will also consider any further comments about the allegedly incomplete discovery matters."

{¶27} The hearing on pending motions was conducted on October 5, 2020. However, no transcript of the hearing was filed and no judgment entry was issued.

{¶28} On November 19, 2020, a suggestion of bankruptcy and a notice of automatic stay of the proceedings was filed by Gulfport. The trial court stayed the proceedings by a judgment entry dated December 11, 2020, but rescheduled the trial date for May 11, 2021. On April 21, 2021, the trial was continued to July 6, 2021. The bankruptcy stay was lifted on May 24, 2021. A status conference was held June 24, 2021.

{¶29} The trial court addressed the substance of the motion in limine by judgment entry on July 1, 2021, five days prior to the commencement of the jury trial. The July 1, 2021 judgment entry addresses each branch of the omnibus motion. With respect to the portion of the motion in limine on appeal, the entry reads:

Next up for consideration is the remaining part of [Tera's] Motion in Limine addressing whether to bar evidence related to untimely discovery production and whether to bar [the oil and gas companies'] gas price

challenge due to [the oil and gas companies'] purported failure to provide the required underlying data supporting their theory.

The Court is not overly concerned about late discovery responses at this stage.

[The oil and gas companies] will be entitled to offer proof of their damages theories. However, while they may attempt to rebut the opinions of [Tera's] expert, they may not attack those opinions as erroneous since they failed to disclose the available, underlying data that [Tera] requested.  In other words, while [the oil and gas companies] may challenge opinions, they cannot attack the witness for failing to base his opinions upon information they had but did not provide to [Tera].  Further, it would be unfair for [the oil and gas companies] to present expert testimony if based upon that information.

(7/1/21 J.E., p. 3.)

{¶30}  As a consequence, the jury's computation of damages was based on actual production rather than actual sales. Further, Tera's expert testified that NYMEX was the proper index to determine the price of the gas produced, insofar as he could not determine where the gas was sold in the absence of actual sales data.

{¶31}  The oil and gas companies' liability on Tera's bad faith trespass and conversion claims were resolved on summary judgment in favor of Tera.  The matter proceeded to a jury trial on the issue of damages on July 6, 2021.  By way of interrogatories, the jury found that Tera proved by a preponderance of the evidence that it was entitled to compensatory and future damages based on the oil and gas companies' willful trespass.   The jury further found that the percentage of the tortious conduct attributable to the oil and gas companies was Rice Drilling – 72.2%, Gulfport – 27.8%.

{¶32}  The jury entered a verdict of actual and future damages in the amount of $40,129,357.62. comprised of:

Compensatory damages:  $23,171,454.37

Consequential damages:   $18,958,462.25

Total damages:           $42,129,916.62

Minus royalties:          $2,000,559.00

(7/9/21 J.E., p. 1.)

**{¶33}** The oil and gas companies filed a motion for judgment notwithstanding the verdict and for remittitur. On October 21, 2021, the trial court overruled the motion. The trial court opined that damages need not be proven to a mathematical certainty, as purportedly argued by the oil and gas companies, but rather to a fair degree of probability within a reasonable degree of certainty. The trial court found that Tera had met its burden of proof based on the expert testimony of a petroleum engineer, who testified on behalf of Tera at trial. Next, the trial court declined to substitute its opinion for the opinion of the jury regarding the proper index by which the gas was valued. Third, the trial court held that future damages were not speculative. The trial court predicated its conclusion on the testimony of Tera's expert, who opined that no oil and gas company would drill a new well to capture the remainder of the gas beneath Tera's property. He further testified that the Ohio Department of Natural Resources ("ODNR") would not likely approve any additional wells due to spacing requirements. The trial court rejected as speculation the oil and gas companies' argument that the wells could be purchased by other gas companies. Finally, the trial court declined to revisit the application of the pv-10 formula to the calculation of actual damages, which the oil and gas companies asserted was akin to pre-judgment interest.

### LEASE INTERPRETATION AND INTENTIONAL TRESPASS

### ASSIGNMENT OF ERROR NO. 1

**THE TRIAL COURT ERRED IN GRANTING [TERA'S] MOTION FOR SUMMARY JUDGMENT ON [TERA'S] TRESPASS AND CONVERSION CLAIMS AND DENYING [THE LESSEE'S] MOTION FOR SUMMARY JUDGMENT ON [TERA'S] TRESPASS, CONVERSION, AND UNJUST ENRICHMENT CLAIMS.**

Case No. 21 BE 0047

{¶34} The first and second assignments of error are from the trial court's judgment entries on summary judgment. An appellate court conducts a *de novo* review of a trial court's decision to grant summary judgment, using the same standards as the trial court set forth in Civ.R. 56(C). *Grafton v. Ohio Edison Co.,* 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Before summary judgment can be granted, the trial court must determine that: (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most favorably in favor of the party against whom the motion for summary judgment is made, the conclusion is adverse to that party. *Temple v. Wean United, Inc.,* 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977). Whether a fact is "material" depends on the substantive law of the claim being litigated. *Hoyt, Inc. v. Gordon & Assoc., Inc.*, 104 Ohio App.3d 598, 603, 662 N.E.2d 1088 (8th Dist.1995).

{¶35} "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." (Emphasis deleted.) *Dresher v. Burt*, 75 Ohio St.3d 280, 296, 662 N.E.2d 264 (1996). If the moving party carries its burden, the nonmoving party has a reciprocal burden of setting forth specific facts showing that there is a genuine issue for trial. *Id.* at 293. In other words, when presented with a properly supported motion for summary judgment, the nonmoving party must produce some evidence to suggest that a reasonable factfinder could rule in that party's favor. *Doe v. Skaggs*, 7th Dist. No. 18 BE 0005, 2018-Ohio-5402, ¶ 11.

{¶36} The evidentiary materials to support a motion for summary judgment are listed in Civ.R. 56(C) and include the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact that have been filed in the case. In resolving the motion, the court views the evidence in a light most favorable to the nonmoving party. *Temple*, 50 Ohio St.2d at 327.

{¶37} In Ohio, an oil and gas lease will convey to the lessee/operator the right to produce oil and gas from all geological formations under the leased property, unless there is specific language contained in the lease limiting the depth or formations from which oil

and gas can be produced. *Marshall v. Beekay Co.*, 2015-Ohio-238, 27 N.E.3d 1 (4th Dist. 2015); *K & D Farms, Ltd. v. Enervest Operating, LLC*, 2015-Ohio-4475, 2015CA00038 (5th Dist. 2015); and *American Energy - UTICA, LLC v. Fuller*, 2018-Ohio-3250, 17 CA 000028 (5th Dist. 2018).

**{¶38}** It is a well-known and established principle of contract interpretation that "[c]ontracts are to be interpreted so as to carry out the intent of the parties, as that intent is evidenced by the contractual language." *Skivolocki v. E. Ohio Gas Co.*, 38 Ohio St.2d 244, 313 N.E.2d 374 (1974), paragraph one of the syllabus. Words and phrases are given their common and ordinary meanings unless another definition is clearly evident in the contract itself or there would be manifest absurdity. *Shifrin v. Forest City Ent., Inc.*, 64 Ohio St.3d 635, 638, 597 N.E.2d 499 (1992). "As a matter of law, a contract is unambiguous if it can be given a definite legal meaning." *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256 ¶ 11.

**{¶39}** Terms in a contract are ambiguous if their meanings cannot be determined from reading the entire contract, or if they are reasonably susceptible to multiple interpretations. *First Natl. Bank of Pennsylvania v. Nader*, 2017-Ohio-1482, 89 N.E.3d 274, ¶ 25 (9th Dist.) Parol evidence is used only to interpret the terms, and not to contradict them. *Id.*, citing *Blosser v. Enderlin*, 113 Ohio St. 121, 134, 148 N.E. 393 (1925). Further, parol evidence may be used to explain the ambiguity in a document even though the document contains an integration clause. *Doody Co. v. Montgomery Ward & Co.*, 10th Dist. Franklin No. 83AP-254, 1984 WL 5717, *5 "The decision as to whether a contract is ambiguous and thus requires extrinsic evidence to ascertain its meaning is one of law." *Nader*, quoting *Ohio Historical Soc. v. Gen. Maintenance and Eng. Co.*, 65 Ohio App.3d 139, 146, 583 N.E.2d 340 (10th Dist.1989).

**{¶40}** Extrinsic evidence is likewise admissible when circumstances surrounding the agreement give the plain language special meaning. *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 313-314, 667 N.E.2d 949 (1996). This is particularly true "when circumstances surrounding an agreement invest the language of the contract with a special meaning, [because] extrinsic evidence can be considered in an effort to give effect to the parties' intention." *Martin Marietta Magnesia Specialties, L.L.C. v. Pub. Util. Comm.*, 129 Ohio St.3d 485, 2011-Ohio-4189, 954 N.E.2d 104, ¶ 29. Extrinsic evidence can

include "(1) the circumstances surrounding the parties at the time the contract was made, (2) the objectives the parties intended to accomplish by entering into the contract, and (3) any acts by the parties that demonstrate the construction they gave to their agreement." *Lutz v. Chesapeake Appalachia, L.L.C.*, 148 Ohio St.3d 524, 2016-Ohio-7549, 71 N.E.3d 1010, ¶ 9.

{¶41} On this topic, the Ohio Supreme Court has observed:

It is well-settled that although extrinsic evidence of a general custom or trade usage cannot vary the terms of an express contract, such evidence is permissible to show that the parties to a written agreement employed terms having a special meaning within a certain geographic location or a particular trade or industry, not reflected on the face of the agreement.

*Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 248, 374 N.E.2d 146 (1978).

{¶42} The *Alexander* Court found that an affidavit of one driller was insufficient to raise a genuine issue of material fact for summary judgment purposes on the meaning of the terms "oil" and "gas" where the issue was whether those contractual terms would include both the natural and the refined forms of the substances. The Court concluded that the affidavit did not "evince a custom or usage so widespread in the oil and gas industries as to support a valid presumption that the parties having knowledge of the special usage, must have intended limited meanings when they employed the terms." *Id.* at 248, 374 N.E.2d 146.

{¶43} Words or phrases should not be read in isolation. *Dominish v. Nationwide Ins. Co.*, 129 Ohio St.3d 466, 2011-Ohio-4102, 953 N.E.2d 820, ¶ 8. If parol evidence is then employed and it fails to clarify the meaning of the contract, then the contract is strictly construed against the drafter. Interpreting the written instrument against the drafter is a secondary rule of contract construction. *Cadle v. D'Amico*, 2016-Ohio-4747, 66 N.E.3d 1184, ¶ 33 (7th Dist.) ("Construing a contract against the drafter is a secondary rule of contract construction, and is applicable when the primary rules of contract construction * * * fail to clarify the meaning of the contract.").

**{¶44}** The determination of whether a contract is ambiguous is a question of law subject to de novo review on appeal. *Bond v. Halcon Energy Properties, Inc.*, 7th Dist. Mahoning No. 15 MA 0178, 2017-Ohio-7754, ¶ 23-24. If the contract is ambiguous, ascertaining the parties' intent constitutes a question of fact. *Hoppel v. Feldman*, 7th Dist. No. 09CO34, 2011-Ohio-1183, ¶ 33; *Hague v. Summit Acres Skilled Nursing & Rehab.*, 7th Dist. No. 09NO364, 2010-Ohio-6404, ¶ 21.

**{¶45}** While ambiguous contracts are construed against the drafter, that rule of construction is merely a guiding principle the court uses in determining the parties' intent after viewing the extrinsic evidence presented by the parties. *Cocca Dev. v. Mahoning Cty. Bd. of Commrs.*, 7th Dist. No. 08MA163, 2010-Ohio-3166, ¶ 27, citing *Handel's Ent., Inc. v. Wood*, 7th Dist. Nos. 04MA238, 05MA70, 2005-Ohio-6922, ¶ 104, and quoting *Beverly v. Parilla*, 165 Ohio App.3d 802, 848 N.E.2d 881, 2006-Ohio-1286, ¶ 30. Therefore, when a contract is deemed ambiguous, typically summary judgment should not be granted. *7 Med. Sys., L.L.C. v. Open MRI of Steubenville*, 7th Dist. No. 11 JE 23, 2012-Ohio-3009, ¶ 20.

**{¶46}** In the first two judgment entries at issue in this appeal, the trial court opined that the language of the lease is unambiguous, and further concluded that landing wells in and extracting gas from the Point Pleasant underlying the leased premises constitutes bad faith trespass and conversion by the oil and gas companies. The trial court predicated its determination of bad faith on the lack of ambiguity in the lease.

**{¶47}** More specifically, the trial court concluded that the phrase "the formation commonly known as the Utica Shale" was unambiguous, and therefore, the trial court did not consider any evidence regarding the parties' negotiations or the history of the nomenclature surrounding the Utica Shale play. The trial court observed, "it is undisputed that the Point Pleasant formation is the geological formation immediately below the Utica Shale formation." (6/3/2020 J.E., p. 2.) The trial court further cited the reservation section, which reserved "the right to all products * * * (3) in all formations below that base of the Utica Shale," in support of the summary judgment entry.

**{¶48}** Both parties offered expert reports from a geologist and a chemical engineer. The geologists' reports addressed two issues. First, whether the Utica Shale and the Point Pleasant are separate geological units, and second, whether the phrase

"the formation commonly known as the Utica Shale" had a special meaning in Ohio in 2013 and 2014, when the leases were executed, that is not reflected on the face of the agreements. The chemical engineers' reports addressed the percentage of gas produced from the rock units at issue and the amount and valuation of the gas remaining below the leased premises.

{¶49} Having considered the contract language at issue in this appeal, we find that the contract language is unambiguous. The grant of lease provision reads, in pertinent part, "Lessor * * * hereby leases * * * all the oil, gas, minerals and their constituents (not including coal) in the formation[ ] commonly known as * * * the Utica Shale * * *." (Plaintiff's Trial Exhibit No. 1, p. 1.)

{¶50} Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly. R.C. 1.42. "The Utica Shale" has a technical stratigraphic meaning. The oil and gas companies contend that the phrase "commonly known as," which modifies the term "Utica Shale," compels us to conclude that the contract language is ambiguous. However, we find that the phrase "commonly known as" simply memorializes the rule of contract interpretation that obliges a court to rely on the common meaning of words, unless doing so would cause an absurd result.

{¶51} Assuming arguendo that the phrase "commonly known as" creates ambiguity, the reservations section within Article One in each lease reads, in pertinent part, "[t]he Lessor reserves all rights not specifically granted to Lessee in this Lease. Lessor specifically reserves the right to all products contained * * * in all formations below the base of the Utica Shale." (*Id.*, p. 2.) It is undisputed that the Point Pleasant is a formation below the Utica Shale. Consequently, we find that Shaw unambiguously reserved the Point Pleasant formation from the lease. To the extent that ambiguity exists within the "grant of lease" provision, we conclude that it is clarified by the plain language of the reservation section. Finally, insofar as the contract language is unambiguous, we need not consider any parol evidence.

{¶52} For the foregoing reasons, we find that the first assignment of error has no merit and we affirm the entry of summary judgment in favor of Tera and against the oil and gas companies on Tera's trespass and conversion claims.

## ASSIGNMENT OF ERROR NO. 2

**THE TRIAL COURT ERRED IN GRANTING [TERA'S] MOTION FOR SUMMARY JUDGMENT AS TO [THE LESSEE'S] BAD FAITH AND DENYING [THE LESSEE'S] MOTION ON THE SAME ISSUE.**

**{¶53}** When a trespasser in Ohio commits the trespass willfully, and with the knowledge that he is invading the rights of another, or under such circumstances as to charge him with knowledge of the character of his act, the measure of damages is the market value of the minerals "at the mouth of the mine," at the time of removal, without any deduction for the cost of labor and other expenses incurred in severing and transporting them to that point. *Brady v. Stafford*, 115 Ohio St. 67, 152 N.E. 188 (1926); *Tracy v. Athens & Pomeroy Coal and Land Co.*, 115 Ohio St. 298, 152 N.E.2d 641 (1926).

**{¶54}** The law does not permit a willful wrongdoer to profit by recovering a part of the expense he may have incurred by reason of his wrongful act, or any profit he might have realized therefrom, but allows this amount to the injured party as part of his measure of damages for the wrong that he has suffered. *Brady, supra.* The deliberate trespasser is prevented from reaping any advantage from his wrongdoing, not strictly as a matter of right to the property owner, but also to deter other wrongdoers. *Athens & Pomeroy Coal and Land Co. v. Tracy*, 22 Ohio App. 21, 153 N.E. 240 (1925), aff'd; *Tracy v. Athens & Pomeroy Coal and Land Co., supra*.

**{¶55}** The act of trespassing creates a presumption of willfulness and places on the defendant not merely the burden of going forward, but also of proving by a preponderance of the evidence that he acted in good faith. *Athens & Pomeroy Coal, supra*, at 31. There is a legal presumption of wrongful taking on the part of the defendant whenever the plaintiff establishes a prima facie case that the defendant has wrongfully interfered with plaintiff's property interests in removing his coal. *Id.* The question of good faith is an issue of ultimate fact as to whether or not there was bona fide belief of right in the action taken and complained of, to be arrived at by the trier of the facts from all the relevant material evidence adduced in the case. *Bamer v. Tiger, Inc.*, 5th Dist. Muskingum No. CA-86-17, 1987 WL 11004, citing *Runkle v. Muskingum Coal Co.* (Musk.C.P.1955), 74 OLA 339.

**{¶56}** The oil and gas companies argue that the facts of the foregoing cases are distinguishable from the facts in the case sub judice because the coal companies had no lease to enter the surface of the property. However, the same is true here, as Shaw unambiguously reserved the subsurface rights to the Point Pleasant and it is undisputed that Rice Drilling intentionally drilled into and extracted minerals from the Point Pleasant.

**{¶57}** Further, although "[t]he question of good faith is an issue of ultimate fact as to whether or not there was bona fide belief of right in the action taken," *Bamer, supra*, we find that the contract language is only susceptible to one reasonable interpretation. Consequently, there is no set of facts by which the oil and gas companies could demonstrate a good faith belief of right to drilling into and extracting minerals from the Point Pleasant.

**{¶58}** For the foregoing reasons, we find that the second assignment of error has no merit and we affirm the entry of summary judgment in favor of Tera and against the oil and gas companies on the bad faith nature of the trespass claim.

## DAMAGES AND PRE-JUDGMENT INTEREST

**{¶59}** The final four assignments of error are addressed out of order for clarity of analysis. They challenge the sufficiency of the evidence and certain evidentiary rulings by the trial court that formed the basis for the jury's calculation of both the actual and future damages.

**{¶60}** First, the oil and gas companies contend that Tera failed to prove the existence of actual damages to a reasonable degree of scientific certainly. Paul M. Herzing, the chemical engineer who offered expert testimony on behalf of Tera on damages at the trial, concluded that 90 percent of the gas produced by Rice Drilling from the six wells at issue in this case originated from the Point Pleasant, with the remaining 10 percent originating from the Utica Shale.

**{¶61}** Robert W. Chase, Ph.D., the former head of the petroleum engineering and geology department at Marietta College, offered expert testimony on behalf of the oil and gas companies. He opined that the actual amounts of gas taken from the two formations were scientifically incalculable. However, Chase further opined that, to the extent it is possible to determine the percentage of gas originating from each of the rock units, the

division in more likely 60 percent from the Point Pleasant and 40 percent from the Utica Shale.

**{¶62}** The oil and gas companies likewise challenge Herzing's testimony regarding future damages. Herzing opined that a new well would be both economically unfeasible (due to the expense of drilling a well vs. the value of the gas remaining in the ground), and practically impossible due to current well spacing requirements in Ohio. Lastly, the oil and gas companies contend that the jury awarded damages to Tera for a period of time when Shaw was the record owner of a portion of the property.

**{¶63}** The oil and gas companies advance two arguments regarding the jury's calculation of damages. First, they argue that the trial court abused its discretion in excluding the actual sales data, due to their alleged failure to provide said data prior to the close of discovery. Next, the oil and gas companies argue that the trial court erred in failing to instruct the jury that the damages in this case are measured at the wellhead. The oil and gas companies assert that the law announced in *Brady, supra,* requires the jury to calculate damages based on local indices, as opposed to the NYMEX price, which is generated in Louisiana.

**{¶64}** Finally, the oil and gas companies argue that the trial court erred in permitting the jury to consider the application of the pv-10 multiplier to the actual damage award. The oil and gas companies argue that the additional damages resulting from the application of the pv-10 multiplier result in an award akin to pre-judgment interest, which in Ohio may only be awarded by the trial court.

## ASSIGNMENT OF ERROR NO. 4

**THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT DENIED [THE LESSEE'S] MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT BECAUSE [TERA] FAILED TO PROVE ITS DAMAGES TO A REASONABLE DEGREE OF CERTAINTY.**

**{¶65}** Before addressing the jury's damages award, it is important to note that Tera did not demand that the oil and gas companies cease production from the six wells

at issue in this appeal. Shaw conceded at trial that he "never asked the wells be shut down. [He did not] remember ever asking." (Trial Tr., p. 90.)

**{¶66}** Further, production continued at least through the date of trial. During oral argument regarding the existence of future damages, counsel for the oil and gas companies asserted:

> And as we have argued, future damages are not available here as a matter of law. [Tera] has not shown that the gas in the ground has been irreparably harmed, rendered inaccessible or destroyed.

> [Herzing], himself has said that the gas will continue to be produced. It's not damaged. It's not inaccessible. [Tera] hasn't even asked [the oil and gas companies] to stop producing it.

(*Id.*, p. 360.)

**{¶67}** In their fourth assignment of error, the oil and gas companies assert that the trial court erred as a matter of law when it overruled their motion for judgment notwithstanding the verdict based on their argument that Tera failed to prove the existence of both actual and future damages to a reasonable degree of certainty. Appellate courts review decisions to grant or deny a motion for JNOV under a de novo standard of review. *Environmental Network Corp. v. Goodman Weiss Miller, LLP*, 119 Ohio St.3d 209, 2008-Ohio-3833, 893 N.E.2d 173, ¶ 22. As a consequence, we apply the same test the trial court applies in determining whether to grant or deny the motion.

**{¶68}** A motion for JNOV filed pursuant to Civ.R. 50(B) tests the legal sufficiency of the evidence. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 25 (a motion for JNOV presents a question of law). When a verdict has been returned, the trial court, in determining whether to sustain a motion for judgment notwithstanding the verdict, must decide, construing the evidence most strongly in favor of the nonmovant, whether the moving party is entitled to judgment as a matter of law. *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.*, 81 Ohio St.3d 677, 679, 693 N.E.2d 271 (1998), citing Civ.R. 50(A)(4). In determining whether to grant or deny a Civ.R. 50(B) motion, the trial court should not weigh the evidence or evaluate the

credibility of the witnesses. *Malone v. Courtyard by Marriott*, 74 Ohio St.3d 440, 445, 659 N.E.2d 1242 (1996).

**{¶69}** Where there is substantial competent evidence favoring the nonmoving party so that reasonable minds might reach different conclusions, a motion for JNOV must be denied. *Ramage v. Cent. Ohio Emergency Serv., Inc.*, 64 Ohio St.3d 97, 109, 592 N.E.2d 828 (1992). "Absent a reason to do otherwise, [a reviewing court presumes] regularity in the jury's verdict." *Bailey v. Providence Healthcare, Mgt., Inc.*, 7th Dist. Columbiana No. 19 CO 0008, 2019-Ohio-5461, ¶ 12, quoting *Frederick D. Harris, M.D., Inc. v. Univ. Hosps.*, 8th Dist. Cuyahoga Nos. 76724 and 76785, 2002 WL 363593 (Mar. 7, 2002).

**{¶70}** Evid.R. 702 sets forth the standard for determining the admissibility of expert testimony. *State v. Jones*, 90 Ohio St.3d 403, 416, 739 N.E.2d 300 (2000). Evid.R. 702(C) requires that an expert's testimony is based on "reliable scientific, technical, or other specialized information." An expert opinion is competent if it is held to a reasonable degree of scientific or medical certainty. *State v. Jackson*, 92 Ohio St.3d 436, 751 N.E.2d 946 (2001) citing *State v. Benner*, 40 Ohio St.3d 301, 313, 533 N.E.2d 701, 714 (1988). The phrase "reasonable certainty" is synonymous with the term "probability." *Id.* " 'An award of damages must be shown with a reasonable degree of certainty and in some manner other than mere speculation, conjecture, or surmise.' " *Acme Co. v. Saunders TopSoil*, 7th Dist. Mahoning No. 10 MA 93, 2011-Ohio-6423, ¶ 57, quoting *Elias v. Gammel*, 8th Dist. Cuyahoga No. 83365, 2004-Ohio-3464, at ¶ 25.

**{¶71}** In order to collect actual and future damages in this case, Tera first had to demonstrate that it is possible, to a reasonable degree of scientific certainty, to determine the proportionality of the gas removed from the Point Pleasant and the Utica Shale. In order to meet its burden of proof, Tera relied exclusively on the testimony of Herzing.

**{¶72}** At trial, Herzing testified that he "believe[d]" that 100 percent of the gas produced from the six wells at issue originated from the Point Pleasant, but that he employed a 90 percent value for the Point Pleasant and a 10 percent value from the Utica to provide a "conservative value." (Trial Tr., p. 160.)

**{¶73}** Herzing predicated the 90 percent value on a 2018 report from the United States Geological Survey. He opined, "[t]heir analysis said that the wells drilled in the

Point Pleasant hydraulically fractured and producing, produce roughly 94 percent of the production from the Point Pleasant and 6 percent from the overlying Utica." However, the USGS Report was read into the record by Herzing at trial and actually reads, in relevant part:

> As of March 2018 (IHS Markit, 2018), about 94 percent of the wells that produced hydrocarbons from the Utica Shale and Point Pleasant Formation in New York, Pennsylvania, Ohio, and West Virginia were completed in the Point Pleasant Formation. Consequently, 94 percent of the produced natural gas and 98 percent of the oil and natural gas liquids produced from these Utica Shale and Point Pleasant wells were from the Point Pleasant Formation.

(Plaintiff's Exh. 13, Ordovician Point Pleasant/Utica-Lower Paleozoic Total Petroleum System – Revisions to the Utica-Lower Paleozoic Total Petroleum System in the Appalachian Basin Province, USGS Scientific Investigations Report 2019-5025, p. 3.)

{¶74} Herzing further predicated his 90-percent value on microseismic surveys undertaken by Rice Drilling. Microseismic surveys are acquired during the stimulation process to map the fracture extent of the individual fracture stage. Microseismic surveying is a process whereby listening geophone arrays are laid out along the ground surface, placed in nearby wells, or buried several hundred feet under the surface, in an array pattern around the lateral wellbore to be hydraulically fractured. The geophone arrays are calibrated to the wellbore and register sound events during the stimulation of each stage. These sound events are the fracturing of the reservoir rock. The "crack" of the rock, as it is fractured, and resultant sound wave is transmitted through the rock layers to the geophones. The strategic three dimensional location of the geophone arrays provide the ability to map 3D diagrams from where the sound emanated during each [stage's] hydraulic stimulation.

{¶75} Plaintiff's Exhibit 10 is the microseismic survey completed on March 25, 2015 on five of the six wells at issue in this appeal. The Gold Digger 6 had yet to be drilled. Herzing provided the following testimony regarding his interpretation of the microseismic data:

Case No. 21 BE 0047

And, in my report, I summarize that 73 percent of the events that were heard, were heard in the Point Pleasant or below.

* * *

It tells me where the fracture was going. This is a direct correlation from that fracture that's initiated in the wellbore, where is it going in the rock? Is it going up? Is it going down?

* * *

It's important for several reasons. From an engineer, we design these completions. We design these completions to stay within the formation we're trying to produce, and there is a lot of control we have over keeping that hydraulic fracture with that formation.

* * *

So it's important for us to know, to measure this so we know where that fracture treatment is going, and so it's 24 – 26 percent are the Utica and above, and so it's 74 percent in the Point Pleasant and below.

That's affirmation. This design kept that hydraulic fracture treatment in these five wells that we're talking about predominantly in the Point Pleasant Formation.

(Trial Tr., p. 195-196.)

**{¶76}** At trial, Herzing described the process of fracking:

Once we know that we have fractures initiated, we will start adding sand to the water, quarter-pound per gallon.

That sand-laden fluid is carried out into the rock formation and as the fractures are opened up into the rock, we're literally cracking that rock with

this water and it's carrying the sand out into those fractures and packing those fractures full.

When we're finished fracking, we will relieve the pressure and the water flows back. This rock, 8, 10, 12,000 feet, or deeper, depending where in the U.S. you're drilling, is under tremendous overburden pressure of all the layers of rock above it, and those fractures underneath that tremendous weight, want to close back up.

But we've packed those fractures full of sand, called proppant. Proppant sand is the predominant proppant that's used in the industry.

\* \* \*

But that sand stays in place. The water flows back, that sand remains in that fracture and that gives the conduit where the hydrocarbons in the formation first flow into that fracture network, as much as 500 feet, 400 feet away from the wellbore. It's a freeway for the hydrocarbons to reach the wellbore and then be produced to the surface for sales.

(*Id.,* p. 142-144.)

**{¶77}** Herzing further testified that the proppant travels horizontally and downward, but does not travel upward:

We know that the water is going to frack out maybe 500 feet from both sides. We know that the majority of the sand isn't going to make it quite that far out. I also know that water can't carry sand upwards. So when I combine these two [analyses], and the one analysis is telling me, yes there were events up in the Utica, I can't disagree with that, but I also know that those events didn't carry sand out there.

The sand stayed within the Point Pleasant.

I also know that there were many events deeper that the Point Pleasant and sand follows Mother Nature, gravity, and it pulls that sand down. So that's where the sand went.

(*Id.,* p. 199-200.)

**{¶78}** Based on the lack of proppant in the Utica Shale fractures, Herzing opined to a reasonable degree of scientific certainty that 90 percent of the gas produced by Rice Drilling originated from the Point Pleasant. (*Id.,* p. 209.) Herzing conceded on cross-examination that he testified at his deposition that he was not provided any information about proppant placement. (*Id.* at 293-294.)

**{¶79}** However, on cross-examination, he testified that 90 percent of the gas produced by Rice Drilling originated from the Point Pleasant and the rock units below the Point Pleasant. Herzing testified that he "[thought he] clearly stated that 90 percent of the gas that [he] attributed for damages is coming from the Point Pleasant or below. [He] stated that that includes the Lexington and Trenton and that those are formations that are not covered by the lease." (*Id.* at 286.)

**{¶80}** Finally, Herzing testified that the Utica acted as caprock rather than a producing formation. He opined:

Shale is a very dense soft material. Over the years, over my career, a shale is not a good reservoir. Never has been. It's a good cap rock. A good seal. The shales that we are producing are unique. Not all shales are created equally.

These shales have a lot of siltstone within them. They have a lot of impurities. But these impurities are really what are making these shale layers productive.

The Point Pleasant from the analysis – I believe it was a [Rice Drilling] report [Plaintiff's Exhibit 5] they talked about core analysis – summarized the Point Pleasant of having ten or 12 percent porosity, extremely good permeability.

Case No. 21 BE 0047

They described the Utica Shale as being tight. [Rice Drilling] actually terms the Utica Shale over these wells as a caprock, impermeable, non-producing caprock.

(*Id.*, p. 202.)

**{¶81}** With respect to Tera's claim for future damages, Herzing testified that the Point Pleasant was fractured by Rice Drilling, and the hydraulic fracture has gone to the extent of the unit boundary. He further testified that no new well could be drilled based on current ODNR spacing rules, which require an 800-foot offset between wells. In October 2020, ODNR reduced inter-well spacing limitations from 1,000 feet to 800 feet.

**{¶82}** Specifically, Herzing opined:

From a conservation standpoint, [Rice Drilling's continued production from the Point Pleasant] is the most effective way to continue to produce from these wells.

[Rice Drilling] will continue to produce these wells. They will continue to remove natural gas resources from beneath the [surface owner's] acreage in the future until the end of life of these wells.

They will continue to profit by the sale of that natural gas and so, therefore, it's only reasonable that you should award damages for the future revenue stream that [Rice Drilling] will derive from these wells.

(*Id.*)

**{¶83}** Herzing further opined that Tera should be awarded future damages even if the wells are shut down, because it would be economically unfeasible for another gas company to drill a new well, at a cost of $10 million, based on the then-current price of natural gas and the amount of gas that remains in the Point Pleasant. Herzing conceded on cross-examination that it is possible that the oil and gas companies could sell the six wells at issue to another gas company, but he characterized that possibility as speculative.

**{¶84}** Herzing based both his actual and future damage awards on decline curve analyses he performed for each of the six wells. He characterized the decline curve analysis as a "methodology that has been greatly defined over the years and refined to where it's a very accurate forecasting tool." (*Id.* at 120.) He further characterized decline curve analysis as "the most-widely used analysis tool in the [oil and gas] industry to value and project what the future production of any given well is." (*Id.*, p. 119.)

**{¶85}** Herzing described the decline curve analysis, as he applied it here, as follows:

> Producing wells in a given field will exhibit production decline rates similar to a type curve developed for that area. The Point Pleasant wells analyzed with decline curves [ ] yield EUR [estimated ultimate recovery] of the total hydrocarbon production expected to be produced by each well. Each well has a unique initial production rate (IP) determined by many factors, among which are the lateral length of the wellbore and number of stages successfully completed. For publically traded companies, annual reporting of oil and gas reserve estimates is a requirement for compliance with [Securities and Exchange Commission] regulations. All companies operating oil and gas wells in Ohio are also required to report production on a quarterly basis to the ODNR. I have utilized the ODNR reported production for the Point Pleasant wells analyzed to determine volumetric values for expected production from each well, on a per acre basis, for each unit a well is located in [sic].

(Herzing Rep., p. 21.)

**{¶86}** Herzing testified that the pv-10 multiplier is an industry-standard multiplier used in conducting decline curve analysis, and "an economic calculation of what the future sum of money is worth today." (Herzing Depo., 202.) More specifically, Herzing testified:

> It is a formula, PV10 formula, that takes the future value that's derived, and based off of the percentage that – that one chooses, and I've seen PV8, 9,

Case No. 21 BE 0047

10, whatever you tend to apply, or want to apply, and it calculates back the value today as if that value were invested at whatever percentage that you decide, it arrives at a future value.

(*Id.*)  Herzing testified that the pv-10 value constitutes the present value of damages as of the day that his expert report "was written."  Herzing's expert report is not dated.  However, he stated at trial that his report was "ran as of June 2020."  (Trial Tr., p. 169.)

**{¶87}** Herzing's damage calculations appear, without further explanation, to be incorrect.  When Herzing was confronted on cross-examination regarding the fact that his calculations did not bear out, he could not recall the explanation.  On re-direct, Herzing was reminded that he applied a 1.08 multiplier to his calculations, due to an adjustment based on the 1080 BTU gas value reported by Rice Drilling.  He explained at his deposition that it is standard to adjust NYMEX prices for the BTU value of gas.    Herzing conceded that he did not know if Rice Drilling's contracts contained a BTU adjustment, but he asserted that "they would have a lot to answer to their shareholders if they didn't."  (*Id.* at 184.)

**{¶88}** With respect to Herzing's allocation of damages on a surface-acreage basis, he cited the prepared testimony of Derek Rice from a unitization application.  Derek Rice opined that the reservoir quality across the Point Pleasant is equal.  The prepared testimony reads, "There are similar geological properties across the entire unit and therefore there are similar production capabilities across the entire unit as well. * * * The reservoir quality across the unit is equal, and therefore an appropriate method of allocation would be on a surface acreage basis." (*Id.*, p. 237.)

**{¶89}** Herzing inputted the data from Rice Drilling's ODNR quarterly production reports for each well into the PHDwin software program, which generates the best fit curve.  Herzing testified that the curve can be altered, although it is rarely necessary based on the precision of the software, then the software calculates the decline curve analysis based on the forty-year life of each well. Despite the fact that the well began production in 2015, with the exception of the Gold Digger 6, which began production in 2017, Herzing ran his analysis from 2020 to 2060.  Herzing testified that the timeframe employed was not relevant (45 years vs. 40 years), as the exhaustion of the entirety of the subsurface minerals was the point of the calculation.

{¶90} According to Herzing, valuing the entire stream, past and future, makes whole Tera who suffered an intentional trespass. Based on the decline curve analysis, Herzing opined that less than half of the natural gas remained in the property under the Gold Digger 1H. He estimated that the average well is drilled at a cost of $10 million to drill. He explained that, even if an infill well was drilled between the Gold Digger 1H and 3H, less than half of the minerals remain, therefore, the investment will not be recovered. He opined that an exponential increase in the price of natural gas from $60.00 to $80.00 per Mcf would be necessary to make any investment sound. He further testified that the highest price during his over-thirty year career was $14.00, and that natural gas closed at $3.70 on the day before the trial.

{¶91} Chase opined that Herzing used the wrong production data and the wrong sales price information. He further opined that Herzing's allocation of gas from the Point Pleasant versus the Utica Shale was erroneous. Next, Chase testified that Herzing erred in predicating the damage award on the parcel allocation in the drilling unit. Finally, he testified that the ongoing production from the wells foreclosed the future damages award in its entirety.

{¶92} Based on the microseismic data, Chase opined that there was clear evidence that the fractures grew up into the Utica Shale. In other words, Chase disagreed with Herzing's conclusion that the Utica Shale acts solely as caprock in Belmont County. However, Chase conceded on cross-examination that Rice Drilling referred to the Utica Shale in a presentation as "the impermeable Utica cap." (*Id.,* p. 442.)

{¶93} Chase further opined that the horizontal fractures typically favored one side of the wellbore, therefore Herzing's reliance on the parcel allocation was misplaced. Chase concluded additional scientific analysis was necessary to determine the amount of gas produced from Tera's property.

{¶94} Likewise based on the microseismic data, Chase opined that 60 percent of the gas produced by Rice Drilling originated in the Point Pleasant, with 40 percent originating from the Utica Shale. He predicated his conclusion on the thickness of the Utica Shale, which he opined was thirty to fifty percent thicker than the Point Pleasant. Further, he criticized Herzing's reliance on the USGS report, insofar as the report documents the percentage of wells landed in the Point Pleasant, not the percentage of

gas produced from the Point Pleasant versus the Utica Shale from wells landed in the Point Pleasant.

{¶95} Next, Chase opined that Herzing's use of the pv-10 multiplier to Tera's actual damages was erroneous. Chase explained:

> I probably would not have used 10 percent. Because of the risk. There's less risk when money has already been made; whereas money in the future using 10 percent is an acceptable risk factor and that the [SEC] recommends to big companies to use.

(*Id.,* p. 422.)

{¶96} Chase likewise criticized Herzing's use of the NYMEX price. Chase testified that there are a number of index prices in the Appalachian basin. Chase opined that the TETCO M2 or the Dominion Transmision were the proper indices.

{¶97} Lastly, Chase opined that Tera was not entitled to future damages because the wells were still producing. He testified, "[Tera] will get [its] royalties or [it] will get [its] damages as that gas is produced from the well." (*Id.,* p. 417.)

{¶98} However, Chase conceded that "[t]he big conflict can come if, for example, [the oil and gas companies] decide to – they could, for example, plug the well." (*Id.,* p. 417-418.) More specifically, Chase opined:

> If they plug the well completely, that gas would be left in the ground, yet [Tera] would have been paid for it.

> Or they could decide to sell the wells to another party, in which case the party would still be responsible for paying some royalties to [Tera], but they would have already been paid one time.

> So it's almost like they would be able to get paid double for what's still in the ground.

(*Id.,* p. 418.) It is important to note that Chase refers to future royalties, when the trial court had already concluded that the Point Pleasant was not leased to the oil and gas

companies, and therefore, production from the Point Pleasant is not subject to the terms of the leases.

{¶99} Chase conceded at trial that he had opined in his expert report that all six of the wells at issue in this appeal were landed in the Utica Shale. He testified, "[t]hat was before I had data presented to me at my deposition, and then I agreed that they were all in the Point Pleasant. (*Id.,* p. 441.)

{¶100} Based on the foregoing testimony, we find that there was substantial competent evidence supporting the jury's conclusion with respect to the existence of both actual and future damages in this case. Herzing's testimony provided a sufficient basis for the jury to conclude that 90 percent of the gas produced by Rice Drilling originated from the Point Pleasant. Further, Herzing's application of the decline curve analysis established, within a reasonable degree of scientific certainty, that the majority of the gas has been removed from the Point Pleasant, and that the remaining gas has been rendered inaccessible by Rice Drilling to anyone other than Rice Drilling.

{¶101} There was speculation from both sides regarding the possibility of future events, such as a historical increase in the price of natural gas or Rice Drilling transferring the wells to another oil and gas company. However, between the two parties, the trespasser should be the party to bear the risk of future events. Moreover, having been awarded future damages here, it is axiomatic that Tera would have no right to future royalty payments.

{¶102} Finally, the oil and gas companies contend in their fourth assignment of error that the trial court erred in failing to modify the damages award to exclude the timeframe when Shaw, not Tera, owned certain properties. At trial, during Herzing's cross-examination, the oil and gas companies raised for the first time that Shaw, rather than Tera, was the lessor of a portion of the leased property from the first quarter of 2015 to the last quarter of 2017. The trial court sustained Tera's objection to the introduction of a deed evincing the transfer by Shaw to Tera of a portion of the property (31.177 acres) from which the Gold Digger 1 and 3 wells produce natural gas, that is, parcel numbers

35-00201.000 and 36-00537.000[4], on October 11, 2017.  The Gold Digger 1 and 3 wells began production in the first quarter of 2015.

**{¶103}**  A limited liability company exists as an entity separate from its members and is capable of suing and of being sued. *Torrance v. Rom*, 8th Dist. No. 108818, 2020-Ohio-3971, 157 N.E.3d 172, ¶ 38, appeal not allowed, 161 Ohio St.3d 1440, 2021-Ohio-375, 162 N.E.3d 826, ¶ 37; *Trickett v. Masi*, 11th Dist. Portage No. 2018-P-0006, 2018-Ohio-4270, 2018 WL 5257914, ¶ 19, citing *Disciplinary Counsel v. Kafele*, 108 Ohio St.3d 283, 2006-Ohio-904, 843 N.E.2d 169, ¶ 18; *Cleveland Bar Assn. v. Pearlman*, 106 Ohio St.3d 136, 2005-Ohio-4107, 832 N.E.2d 1193, ¶ 36 (O'Donnell, J., dissenting); *Ogle v. Hocking Cty.*, 4th Dist. Hocking No. 14CA3, 2014-Ohio-5422, 2014 WL 6977628, ¶ 25. "Thus, members of a limited liability company, even if they are the sole members of the company, do not have standing to sue on its behalf." *Id.*  See also *Estep v. Xanterra Kingsmill, L.L.C.*, E.D. Va. No. 4:16-cv-89, 2017 WL 1103179, *2 (Mar. 20, 2017), citing *Matthews v. HSBC Bank USA*, E.D. Va. No. 1:14cv810, 2014 WL 12538173 (July 25, 2014) ("Even if [the sole and managing member of an L.L.C.] has suffered personal damage as a consequence of any damage to [the L.L.C.], he has no standing to state a claim for those damages" in his individual capacity) (citations omitted);  *Orgain v. Salisbury*, 521 F.Supp.2d 465, 476, fn. 33 (D. Md. 2007) ("Shareholders (or in the case of an L.L.C., its members) do not have standing to sue on the corporation's behalf.") (citations omitted).

**{¶104}**  Moreover, "the requirement that a [limited liability company] be treated as a separate legal entity applies regardless of the income tax treatment elected by the L.L.C.'s member(s)." *Estep* at ¶ 4. Here, we find that the converse is true, that is, an LLC cannot sue on behalf of its members.  As a consequence, we find that Tera did not have standing to assert a claim for trespass and conversion with respect to the two parcels at issue prior to October of 2017.

**{¶105}**  Tera argues that the oil and gas companies waived the argument based on their failure to timely raise the standing issue, and their repeated concession that Tera was the owner of the property prior to trial.  Tera asserts that the oil and gas companies

---

[4] The deed likewise transfers Parcel No. 34-01260.000. However, according to the Herzing Expert Report, none of the wells produce from that parcel.

chose to hold back their argument until Shaw's claims were barred by the statute of limitations.

{¶106} "A preliminary inquiry in all legal claims is the issue of standing." *Cuyahoga Cty. Bd. of Commrs. v. State*, 112 Ohio St.3d 59, 2006-Ohio-6499, 858 N.E.2d 330, ¶ 22. Standing is a constitutionally imposed jurisdictional requirement. *ProgressOhio.org, Inc. v. JobsOhio*, 139 Ohio St.3d 520, 2014-Ohio-2382, 13 N.E.3d 1101, ¶ 11. Ohio Constitution, Article IV, Section 4(B) provides that common pleas courts "shall have such original jurisdiction over all justiciable matters." "A matter is justiciable only if the complaining party has standing to sue." *ProgressOhio.org* at id., citing *Fed. Home Loan Mtge. Corp. v. Schwartzwald*, 134 Ohio St.3d 13, 2012-Ohio-5017, 979 N.E.2d 1214.

{¶107} In *Moore v. Middletown*, 133 Ohio St.3d 55, 2012-Ohio-3897, 975 N.E.2d 977, the Supreme Court of Ohio stated the requirements for standing as follows:

> To succeed in establishing standing, plaintiffs must show that they suffered (1) an injury that is (2) fairly traceable to the defendant's allegedly unlawful conduct, and (3) likely to be redressed by the requested relief. These three factors — injury, causation, and redressability — constitute "the irreducible constitutional minimum of standing."

*Id.* at ¶ 22, quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

{¶108} "Common-law standing is similar to Civ.R. 17(A)'s real-party-in-interest requirement." *Abroms v. Synergy Bldg. Sys.*, 2d Dist. No. 23944, 2011-Ohio-2180, ¶ 46. While the real-party-in-interest rule under Civ.R. 17(A) concerns proper party joinder, it does not address standing. *Schwartzwald* at ¶ 33, citing *Lincoln Property Co. v. Roche*, 546 U.S. 81, 90 (2005). "Indeed, one who has standing by possessing a 'personal stake' in a lawsuit undoubtedly also has a 'real interest in the subject matter of the litigation.'" *Abroms* at ¶ 46. "Thus, courts often conflate common-law standing and Civ.R. 17, treating them as one and the same." *Id.*, citing *State ex rel. Jones v. Suster*, 84 Ohio St.3d 70, 77 (1998) ("Although a court may have subject matter jurisdiction over an action, if a claim

is asserted by one who is not the real party in interest, then the party lacks standing to prosecute the action.").

**{¶109}** Standing is a "jurisdictional requirement" that must be met for a party to maintain a lawsuit. *State ex rel. Dallman v. Franklin Cty. Court of Common Pleas*, 35 Ohio St.2d 176, 179, 298 N.E.2d 515 (1973). Thus, standing "may be raised at any time during the pendency of the proceedings," *New Boston Coke Corp. v. Tyler*, 32 Ohio St.3d 216, 513 N.E.2d 302 (1987), paragraph two of the syllabus, including by a reviewing court sua sponte, *Dallman* at 178, 298 N.E.2d 515 (Ohio Supreme Court sua sponte raising the issue of standing and dismissing the appeal based on a party's failure to allege a personal stake in the outcome of the proceedings). Accordingly, we find that Tera did not have standing to assert trespass and conversion claims on behalf of Shaw.

**{¶110}** Finally, Tera argues that Shaw's trespass claim was transferred as a matter of law by virtue of the 2017 general warranty deed. Tera cites R.C. 5302.04, which reads, in its entirety, "[i]n a conveyance of real estate or any interest therein, all rights, easements, privileges, and appurtenances belonging to the granted estate shall be included in the conveyance, unless the contrary is stated in the deed, and it is unnecessary to enumerate or mention them either generally or specifically."

**{¶111}** It is well settled in Ohio that a plaintiff must be in actual or constructive possession of the premises upon which the trespass is committed at the time of the trespass. *Rowland v. Rowland*, 8 Ohio 40, 41 (1837). Further, the Ninth District has held that R.C. 5302.04 does not convey a cause of action relating to harm to real property by merely transferring title to the property.

**{¶112}** In *Prince v. Jordan*, 9th Dist. Lorain No. 97CA006906, 1998 WL 668254, at *4 (Sept. 30, 1998), the Ninth District held that a chose in action[5] for damage to real property did not transfer to the purchaser of the real property merely because the fee interest had been transferred. The plaintiff in *Prince* sought to recover damages for harm

---

[5] Black's Law Dictionary defines "chose in action" as a "right of bringing an action or a right to recover a debt or money" and describes it as a "personal right not reduced into possession, but recoverable by a suit at law." *Black's Law Dictionary* (6 Ed.Rev.1990) 241. Choses in action include the right to recover tort damages. *Id.* "Intangible choses [sic] in action, such as * * * the right to bring a cause of action in a court of law are * * * considered personal property." *Loveman v. Hamilton*, 66 Ohio St.2d 183, 185, 420 N.E.2d 1007 (1981).

to the property prior to the plaintiff's purchase, and pointed to R.C. 5302.04 to argue that the conveyance of the ownership interest automatically included choses of action that arose from the ownership. *Id.*

**{¶113}** The *Prince* Court reasoned "[b]ecause a chose in action is considered personal property, and not an interest in real property, such chose in action is separate from the real property although it arose out of damage to the real property." *Id.* The *Prince* Court held that transfer of title to the property did not automatically transfer a chose of action for damages to the property arising prior to ownership. Accordingly, we find that Shaw's claim did not transfer to Tera by operation of law.

**{¶114}** Herzing opined that Tera sustained compensatory damages in the amount of $43,644,944.00. The jury awarded compensatory damages in the amount of $40,129,357.62. However, the methodology behind the jury's calculation of damages cannot be gleaned from the record. Further, the oil and gas companies could not submit an interrogatory based on evidence the trial court declined to admit. See *Ramage v. Central Ohio Emergency Serv., Inc.*, 64 Ohio St.3d 97, 107, 592 N.E.2d 828 (1992)("Proper jury interrogatories must address determinative issues and must be based upon trial evidence."); see also *Cincinnati Riverfront Coliseum, Inc. v. McNulty Co.*, 28 Ohio St.3d 333, 336-37, 504 N.E.2d 415 (1986)( "The essential purpose to be served by interrogatories is to test the correctness of a general verdict by eliciting from the jury its assessment of the determinative issues presented by a given controversy in the context of evidence presented at trial.") Accordingly, we reverse and vacate the trial court's judgment on the verdict as it relates to compensatory damages and remand this matter for a jury trial on compensatory damages.

**{¶115}** In summary, we find that Appellant's fourth assignment of error challenging the trial court's judgment entry overruling the oil and gas companies' motion for JNOV has no merit, to the extent that it is predicated upon the sufficiency of the evidence establishing actual and future damages. In other words, the judgment on the verdict is affirmed with respect to both the award and the amount of future damages.

**{¶116}** However, we find that the portion of the fourth assignment of error challenging the trial court's decision with respect to the timeframe when Shaw, not Tera, owned a portion of the property is well-taken. Accordingly, the judgment on the verdict is

affirmed in part, with respect to Tera's entitlement to future damages and the amount of future damages, Tera's entitlement to compensatory damages, and the percentages attributable to the oil and gas companies, and reversed and vacated in part, with respect to the amount of compensatory damages because it improperly includes time in which Shaw owned a part of the surface. Therefore, this matter is remanded to the trial court for a jury trial limited solely to the amount of compensatory damages sustained by Tera.

## ASSIGNMENT OF ERROR NO. 6

## THE TRIAL COURT ABUSED ITS DISCRETION IN EXCLUDING DEFENDANTS' EVIDENCE ABOUT THE QUANTITY OF DAMAGES.

**{¶117}** Decisions involving the admissibility of evidence and decisions granting or denying a motion in limine are reviewed under an abuse of discretion standard of review. *Estate of Johnson v. Randall Smith, Inc.*, 135 Ohio St.3d 440, 2013-Ohio-1507, 989 N.E.2d 35, ¶ 22. An abuse of discretion means "an attitude that is unreasonable, arbitrary or unconscionable." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). "[A] trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991).

**{¶118}** Having reviewed the lengthy procedural history of the second phase of this case, we cannot conclude that the trial court abused its discretion in granting the motion in limine. The trial court presided over several discovery disputes that continued throughout the second phase of the litigation all the way up to the week before the trial on damages. The trial court conducted several hearings regarding the oil and gas companies' refusal to provide actual sales data relating to the six wells at issue in this appeal. The oil and gas companies have failed to demonstrate that the trial court's decision to prohibit the introduction of actual sales information was unreasonable or arbitrary based on the trial court's consideration of the arguments presented in the various motions to compel. Accordingly, we find that the sixth assignment of error has no merit

and we affirm the judgment entry sustaining Tera's motion in limine to exclude evidence of actual sales at the hearing on damages.

## ASSIGNMENT OF ERROR NO. 3

**THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY THAT DAMAGES MUST BE MEASURED BY THE VALUE OF THE GAS AT THE TIME AND PLACE OF EXTRACTION.**

**{¶119}** A trial court is obligated to provide a jury with instructions that reflect a correct and complete statement of the law. *Sharp v. Norfolk & W. Ry. Co.*, 72 Ohio St.3d 307, 312, 649 N.E.2d 1219 (1995). However, a determination as to which jury instructions are proper is a matter left to the sound discretion of the trial court and thus, the trial court's formulation of instructions is upheld absent an abuse of discretion. *State v. Wolons*, 44 Ohio St.3d 64, 68, 541 N.E.2d 443 (1989); *State v. Guster*, 66 Ohio St.2d 266, 271, 421 N.E.2d 157 (1981). In evaluating whether the trial court acted unreasonably, unconscionably, or arbitrarily, we consider the jury instructions as a whole. *State v. Jalowiec*, 91 Ohio St.3d 220, 231, 744 N.E.2d 163 (2001). The failure to give a proposed instruction is not reversible where it has not "impaired the theory of the case of the party requesting it." *Oxford Mining Co., LLC v. Ohio Gathering Co., LLC*, 7th Dist. Belmont No. 19 BE 0016, 2020-Ohio-1363, ¶ 82, quoting *R.T. v. Knobeloch*, 2018-Ohio-1596, 111 N.E.3d 588, ¶ 32 (10th Dist.) (the court did not err in refraining from instructing on mitigation).

**{¶120}** The jury instruction at issue in this appeal reads, in pertinent part:

Damages for a willful trespass are measured by the market value of the oil and gas unlawfully produced at the time of removal, and are calculated without any deductions for any cost or expense.

(Trial Tr., p. 560.)

**{¶121}** Chase testified that local indices more accurately reflected the actual damages incurred in this case. Herzing acknowledged that the use of the TETCO price (TETCO is a local index) instead of the NYMEX price would have resulted a reduction in

damages in the amount of $521,000.00, with respect to a single well in a single year, that is the Gold Digger 1H in 2020. (*Id.,* p. 329.)

{¶122} The measure of damages in an intentional trespass case is defined in *Brady, supra,* which reads, in pertinent part:

> Where coal is taken from under the land of another, wilfully, wrongfully, and intentionally, and without right, the measure of damages to the owner of such coal is the market value of the same at the mouth of the mine, without any deduction for the cost of labor and other expenses incurred in severing and transporting such coal to the mouth of the mine.
>
> When coal is taken without right, but innocently or by mistake, and under the bona fide belief that it was property of the taker, the measure of damages to the owner of such coal is the market value of the coal in place. So also may be considered every circumstance, natural or artificial, which tends to enhance or diminish the value of such coal in place.

*Brady*, third and fourth paragraphs of the syllabus.

{¶123} The oil and gas companies argue that the phrase "at the mouth of the mine," rephrased for the purposes of this case as "at the wellhead," means that the gas in this case should be valued, in the absence of evidence of actual sales, according to local indices. Therefore, the oil and gas companies argue that the trial court erred in excluding this language from the jury charge, insofar as it permitted the jury to rely on Herzing's use of the NYMEX price, rather than a local price index, in valuing the gas produced from the Point Pleasant.

{¶124} Tera counters that the phrase "at the wellhead" has a technical meaning that requires the deduction of certain expenses from the value of the gas. Tera cites the public policy behind the *Brady* rule, which prohibits the intentional trespasser from deducting any production cost from the value of the gas, to show that the trial court did not err when it declined to include the phrase "at the wellhead" in the jury instructions.

{¶125} The phrases "at the well" and "at the mouth of the well" in oil and gas leases are relevant to the calculation of royalties, because these phrases have been

interpreted to allow the lessee to allocate post-production costs like transportation and marketing proportionally between the lessor and lessee. However, the oil and gas companies did not propose the "at the wellhead" language in order to reallocate production and marketing costs, but instead, merely sought to convert the *Brady* coal term into an oil and gas term for the purpose of this case.

**{¶126}** Nonetheless, we find that the phrase "the market value of the same at the mouth of mine" in *Brady* refers not to the valuation of gas by local versus national indices, but instead, to the rule that no production costs may be deducted where the defendant commits an intentional trespass. The phrase "the market value of the same at the mouth of mine" is replaced with "the market value of the coal in place" with respect to an innocent trespass. In other words, the two phrases seek to distinguish the right of the innocent trespasser to deduct production expenses ("the market value of the coal in place") versus the prohibition against the deduction of any production costs by the intentional trespasser ("the market value of the same at the mouth of the mine"). As a consequence, the oil and gas companies' theory of the case was not impaired by the trial court's refusal to provide the instruction, because they concede that an intentional trespasser may not deduct production costs from the value of the gas.

**{¶127}** The phrase "at the mouth of the mine" in *Brady, supra,* speaks to the deduction of costs of removal, rather than the location where the price of the coal is set. Accordingly, we find that the oil and gas companies' third assignment of error has no merit, as the trial court did not err in declining to include the phrase "at the mouth of the mine" in the jury charge.

**ASSIGNMENT OF ERROR NO. 5**

**THE TRIAL COURT ERRED AS A MATTER OF LAW AND ABUSED ITS DISCRETION WHEN IT ALLOWED THE JURY TO INCLUDE PREJUDGMENT INTEREST IN ITS CALCULATION OF COMPENSATORY DAMAGES AND REFUSED TO REMIT THE AWARD.**

**{¶128}** The oil and gas companies assert that the jury's application of the pv-10 multiplier to the actual damage award constitutes an award of pre-judgment interest. The

oil and gas companies argue that the jury did not have the power to award pre-judgment interest, as pre-judgment interest is within the exclusive province of the trial court.

**{¶129}** The judgment entry in which the trial court awarded pre-judgment interest, which was not challenged in this appeal, reads, in relevant part, "[t]he Court further finds that the present value testimony testified to by [Herzing] and confirmed by [Chase] that it is the industry standard to have a present value of PV-10 and this is separate and distinct from pre-judgment interest." (10/20/21 J.E., ¶ 12.)

**{¶130}** Herzing testified that his actual damages calculation "is just an addition of all of the individual quarters added up, the total value of the past production based off of future value, fv, because we're taking past production, bringing into the futures [sic] at 10 percent." (Trial Tr., p. 221.) Chase agreed with the application of a multiplier to bring the actual damages award to present value, but argued that ten percent was too great a percentage to apply to past production.

**{¶131}** R.C. 1343.03(C) "was enacted to promote settlement efforts, to prevent parties who have engaged in tortious conduct from frivolously delaying the ultimate resolution of cases, and to encourage good faith efforts to settle controversies outside a trial setting." *Kalain v. Smith*, 25 Ohio St.3d 157, 159, 25 OBR 201, 202, 495 N.E.2d 572, 574 (1986). In addition to promoting settlement, R.C. 1343.03(C), like any statute awarding interest, has the additional purpose of compensating a plaintiff for the defendant's use of money which rightfully belonged to the plaintiff. *Musisca v. Massillon Community Hosp.*, 69 Ohio St.3d 673, 676, 635 N.E.2d 358, 360 (1994), citing *West Virginia v. United States*, 479 U.S. 305, 309–310, 107 S.Ct. 702, 706, 93 L.Ed.2d 639, 646, fn. 2.

**{¶132}** The jury's application of the pv-10 multiplier to the actual damages award in this case does not constitute an improper award of prejudgment interest. The purpose of the prejudgment interest statute is to encourage settlement by tortfeasors prior to trial. The jury did not usurp the authority of the trial court to award prejudgment interest here. The application of the pv-10 multiplier was essential to compensate Tera for the damages sustained due to the oil and gas companies' bad faith trespass.

**{¶133}** Accordingly, we find that the fifth assignment of error has no merit as we find that the jury's actual damages award did not constitute an improper award of prejudgment interest.

## CONCLUSION

**{¶134}** In conclusion, the first two judgment entries awarding summary judgment in favor of Tera and against the oil and gas companies on the bad faith trespass and conversion claims are affirmed.  Likewise, the third judgment entry prohibiting the oil and gas companies from introducing evidence of actual sales at the trial on damages is affirmed. However, the judgment overruling the motion for judgment notwithstanding the verdict is reversed and vacated in part, as it relates to the trial court's failure to admit evidence regarding Shaw's ownership of a portion of the surface from 2015 to October 11, 2017.  The judgment on the verdict is affirmed in part, with respect to Tera's entitlement to future damages and the amount of future damages, Tera's entitlement to compensatory damages, and the percentages attributable to the oil and gas companies, and reversed and vacated in part, with respect to the compensatory damages award.  Accordingly, this matter is remanded to the trial court for a jury trial limited solely to the amount of compensatory damages sustained by Tera.

Donofrio, J., concurs.

Robb, J., dissents with dissenting opinion.

Case No. 21 BE 0047

Robb, J., dissenting opinion

**{¶135}** I dissent to the decision to uphold the trial court's grant of summary judgment to the plaintiff-lessor (Appellee) on the trespass and conversion claims and the corresponding decision to deny the motion for summary judgment filed by the defendant-lessees (Appellants) on Appellee's trespass, conversion, and unjust enrichment claims.

**{¶136}** The plain language of the lease clearly granted the lessee rights in the Point Pleasant formation after employing extrinsic evidence on the specialized meaning of certain terminology used in the lease. The granting clause of the lease grants to the lessee the oil and gas rights "in the formations commonly known as the Marcellus Shale and the Utica Shale, * * * other than as reserved unto Lessor below." In the subsequent reservation clause, the lessor reserves "any and all formations between the base of the Marcellus shale to the top of the formation commonly known as Utica Shale" and reserves "all formations below the base of the Utica Shale." (2013 and 2014 Leases).

**{¶137}** "[C]ommon words appearing in a written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument." *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 245-246, 374 N.E.2d 146 (1978). Extrinsic evidence is not only available when interpreting an ambiguous contract; extrinsic evidence can also be utilized to effect the parties' intent "where the circumstances surrounding the agreement invest the language of the contract with a special meaning." *State ex rel. Petro v. R.J. Reynolds Tobacco Co.,* 104 Ohio St.3d 559, 2004-Ohio-7102, 820 N.E.2d 910, ¶ 23, quoting *Kelly v. Medical Life Ins. Co.*, 31 Ohio St.3d 130, 132, 509 N.E.2d 411 (1987).

**{¶138}** "It is well-settled that although extrinsic evidence of a general custom or trade usage cannot vary the terms of an express contract, such evidence is permissible to show that the parties to a written agreement employed terms having a special meaning within a certain geographic location or a particular trade or industry, not reflected on the face of the agreement." *Alexander*, 53 Ohio St.2d at 248 (affidavit of one well operator did not evince a widespread custom or usage in the oil and gas industry). *See also Latina v. Woodpath Dev. Co.*, 57 Ohio St.3d 212, 214, 567 N.E.2d 262 (1991) ("Parol evidence,

which in this case came in the form of expert testimony, is admissible to provide special meaning given by the industry to language employed in a contract."). Extrinsic evidence may generally include the parties' circumstances when the contract was entered, the parties' contractual goals, and the parties' acts demonstrating their construction of the agreement. *Lutz v. Chesapeake Appalachia, L.L.C.*, 148 Ohio St.3d 524, 2016-Ohio-7549, 71 N.E.3d 1010, ¶ 9.

{¶139} Even assuming the stratigraphic terminology employed by professional geologists should be considered the "ordinary" use of terms in a contract discussing a rock formation, this case involves an oil and gas lease employing a term with special meaning, the use of which was widespread in the geographic location and in the particular trade or industry. Although Utica Shale and Point Pleasant were eventually considered different rock units for strict scientifically geological purposes, they were still considered part of the same shale play by the industry, the regulators, the media, and the general public in the pertinent time period.

{¶140} In the relevant period, Appellant Rice called their assets "Utica wells" in an official federal filing even when they were located within the Point Pleasant formation, and Appellant Gulfport used terminology such as "The Point Pleasant member of the Utica" or equated the Point Pleasant formation with "the heart of the Utica wet gas window." (Boyd Report 2.3, 4.1). Besides these Appellant-companies, Appellee's evidence, which was used to show another company in the industry considered Utica Shale and Point Pleasant to be *geologically* distinct, also shows that company nevertheless included Point Pleasant in "the "Utica Core Area." (Boyd Report 2.3, Slide 6).

{¶141} Appellants' expert attested, "the Utica Shale/Point Pleasant formation has been commonly and collectively known in trade usage within the oil and gas industry, by state and federal governmental agencies, and by the general public in the subject geographic region as the 'Utica Shale.'" (Chase Aff. 2). As Appellee acknowledges, well completion reports submitted to ODNR and well permits issued by ODNR utilized language such as "Pt Pleasant/Utica" or "Utica/Point Pleasant" to describe the "producing formation" (even after the agency sought to encourage separate reporting). (Chase Aff. 40-41); (Boyd Report, Ex. E).

Case No. 21 BE 0047

{¶142} Notably, Appellee's own evidence shows "the late Ordovician age Utica Shale and the underlying Point Pleasant formation" were both considered parts of the Utica Shale play during the pertinent time period (and thereafter). (Boyd Report 2.1.) "The industry recognized the Point Pleasant Formation as a prospect of the Utica Shale play as early as March 2011" where an early well identified the Utica Shale as the drilling target and Point Pleasant as the source of gas. (Boyd Report 2.4). Appellee cited an abstract summarizing a 2013 presentation by the individual who was the state geologist until 2012. Pointing to both Utica and Point Pleasant, this summary said, "most refer to this as the Utica Play." (Boyd Report, Ex. B).

{¶143} The absence of the word "play" after the phrase "Utica Shale" in the lease is not dispositive. Appellee's evidence showed the federal government reported, "The Utica is a stacked play that includes both the Utica formation and the underlying Point Pleasant formation." (Boyd Report, Ex. C). One of the maps used in the former state geologist's 2013 presentation considered Point Pleasant to be encompassed within the term "The Utica" which was described as rising up from the top of the Trenton Limestone. (Boyd Report, Ex. B). Appellee's evidence additionally demonstrates the terms "Utica" or "the Utica Shale" were names informally used to refer to the "Utica Shale play" by the public and the oil and gas industry in eastern Ohio. (Boyd Report 2.3). Appellee's expert, a highly experienced doctor of geology (who also authored the Boyd Report), collectively called the Utica and Point Pleasant formations "Utica Shale" in a 2014 report and recognized the public considered the Utica formation and the Point Pleasant formation "as just the Utica or the Utica play" in the early period of drilling. (Dick Depo. 55, 91-93). When asked about a statement in the Chase report regarding the U.S. Energy Information Administration failing to distinguish the two rocks units, Appellee's geologist noted, "That all changed in 2017." (Dick Depo. 94). However, the court cannot read the lease using later amendments to trade or area usage, which still seemed to merely clarify the presence of a geological unit rather than represent an abrupt change in drilling terminology.

{¶144} In 2013, the local newspaper equated "Utica/Point Pleasant wells" with "Utica wells" when addressing the regional drilling activity. In 2012, the newspaper reported: "Gulfport is drilling into the Utica and Point Pleasant formation, which has been

described as the 'organically rich lower formation of the Utica Shale.'  A report from the Ohio Department of Natural Resources lists 'Utica/Point Pleasant Shale Wells' for the entire state."  Appellee's predecessor and sole LLC member acknowledged receiving most of his information on the topic from the newspaper.  (T. Shaw Depo. 54-55).  Moreover, he entered the lease to avoid mandatory pooling.  (T. Shaw Depo. 96).  (And, the evidence indicated Appellant Rice would never have entered such a generous lease if rights to drill Point Pleasant were excluded.)

{¶145}  The court should not consider the lease language "commonly known as" to be superfluous.  *See generally Transtar Elec., Inc. v. A.E.M. Elec. Servs. Corp.*, 140 Ohio St.3d 193, 2014-Ohio-3095, 16 N.E.3d 645, ¶ 26 (do not interpret contract in a manner which leaves a clause superfluous or meaningless).  This contractual language indicates the parties to the lease intended to use the common shale terminology prevailing at the time.  Modifying "formation" with "commonly known as" expresses the intent to use the regional or industry custom rather than scientifically specific geological terminology to define the term "the Utica Shale."  Point Pleasant is a regional formation, and it was the "key component" of "the Utica shale" or "the Utica shale play."  (Wickstrom Report 34).  According to the state geologist, the regional industry and the regulators did not employ strict geologic terminology when labeling the target below the top of Utica Shale.  (Wickstrom Report 4, 11, 15, 21).  Even federal officials at the United States Geological Survey and the Department of Energy blended the terms during the relevant time period, rather than use strict stratigraphic language.  (Wickstrom Report 15, 21).

{¶146}  Reasonable minds can only find the extrinsic evidence on general custom and/or trade usage in the particular industry and/or geographic area, at the time the leases were entered in 2013 and 2014, showed Point Pleasant was part of the "formation[ ] commonly known as * * * the Utica Shale" as the phrase was used in the granting clause and showed Point Pleasant was not one of the "formations below the base of the Utica Shale" as the phrase is used in the reservation clause.  Rather than being one of the "formations below the base of the Utica Shale," Point Pleasant was commonly known in the area and industry to be a part of "the Utica Shale" at the time the leases were signed.  Accordingly, I would reverse the trial court's decision, as the trial court erred in granting summary judgment to Appellee on the claims of conversion and trespass and in denying

Case No. 21 BE 0047

Appellants' motion for summary judgment (on these claims plus the claim for unjust enrichment).

**{¶147}** Finding this summary judgment decision to be erroneous moots the other assignments of error, which set forth errors triggered by and occurring after this initial summary judgment. For instance, assignment of error two involves the trial court's later summary judgment decision holding the trespass was willful and in bad faith if the lease unambiguously excluded Point Pleasant drilling. Even if the majority were correct on assignment of error one, the trial court's conclusion on bad faith does not necessarily flow as a matter of law merely due to a finding of an unambiguous contract. In any event, I would find the second assignment of error to be moot, as the lease plainly includes Point Pleasant and there was thus no trespass.

**{¶148}** Likewise, assignments of error three through six relate to damages (on topics such as jury instructions, proof, formula, and discovery sanctions). Although the trial court's resolution of these issues is also concerning, these issues are moot under my conclusion that summary judgment should not have been granted on liability in favor of Appellee and thus the case should not have proceeded to trial on damages.

APPROVED:

_____

For the reasons stated in the Opinion rendered herein, it is the final judgment and order of this Court that the trial court's entries awarding summary judgment in favor of Tera on the bad faith trespass and conversion claims are affirmed. The judgment entry prohibiting the oil and gas companies from introducing evidence of actual sales at the trial on damages is affirmed. The judgment overruling the motion for judgment notwithstanding the verdict is reversed and vacated in part, as it relates to the trial court's failure to admit evidence regarding Shaw's ownership of the surface from 2015 to October 11, 2017. The judgment on the verdict is affirmed in part, reversed and vacated in part and this matter is remanded to the Court of Common Pleas of Belmont County, Ohio, for a jury trial limited solely to the amount of compensatory damages sustained by Tera. Costs to be taxed against the Appellants.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**