[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Tera, L.L.C. v. Rice Drilling D, L.L.C.*, Slip Opinion No. 2024-Ohio-1945.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2024-OHIO-1945

TERA, L.L.C., APPELLEE, *v.* RICE DRILLING D, L.L.C., ET AL., APPELLANTS.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Tera, L.L.C. v. Rice Drilling D, L.L.C.*, Slip Opinion No. 2024-Ohio-1945.]

*Contracts—Mineral rights—Summary judgment—Lease terms—Extrinsic evidence—Because there remained genuine issues of material fact to be litigated, neither party is entitled to judgment as a matter of law—Court of appeals' judgment reversed and cause remanded to trial court.*

(No. 2023-0411—Submitted November 14, 2023—Decided May 23, 2024.)

APPEAL from the Court of Appeals for Belmont County, No. 21 BE 0047, 2023-Ohio-273.

_____

STEWART, J.

{¶ 1} In this discretionary appeal from a judgment of the Seventh District Court of Appeals, we are asked to determine whether a lease between appellee, Tera, L.L.C., and appellants, Rice Drilling D, L.L.C., and Gulfport Energy

Corporation, granting to appellants certain mineral rights in "the formation[] commonly known as * * * the Utica Shale" beneath Tera's land included the right for appellants to drill wells into a geological area known as the "Point Pleasant." We are also asked to determine whether there was sufficient evidence to sustain the trial court's award of summary judgment to Tera on its bad-faith-trespass claim against appellants. Because we conclude that there is a genuine issue of material fact regarding the meaning of certain terms in the lease, we reverse the judgment of the Seventh District and remand the case to the trial court for further proceedings.

**Facts and Procedural History**

{¶ 2} This case centers on the interpretation of a lease by which Thomas Shaw agreed to lease to Rice Drilling[1] mineral rights for geological formations beneath the surface of Shaw's land in Belmont County. Tera is Shaw's successor-in-title to the mineral rights. The relevant lease language granting the mineral rights to Rice Drilling ("the grant clause") reads:

> Lessor, in consideration of the payments described herein and the covenants and agreements hereafter contained, hereby leases and lets exclusively to [Rice Drilling] all the oil, gas, minerals and their constituents (not including coal) *in the formations commonly known as the Marcellus Shale and the Utica Shale*, underlying the land described below for the sole purpose of exploring for, drilling, operating, producing and gathering the oil, gas, casinghead gasoline and all other gases and their respective vapors, liquid or gaseous hydrocarbons produced in association therewith *other than as reserved unto Lessor below*.

---

1. The court of appeals' decision states that Rice Drilling thereafter assigned a percentage of its leased mineral interest to appellant Gulfport Energy. 2023-Ohio-273, 205 N.E.3d 1168, ¶ 8.

(Emphasis added.)  The relevant lease language reserving certain mineral rights to the lessor (originally Shaw, now Tera) ("the reservation clause") reads:

> Lessor reserves all rights not specifically granted to Lessee in this Lease.  Lessor specifically reserves the rights to all products contained in any formation: (1) from the surface of the Leased Premises to the top of the formation commonly known as the Marcellus Shale, (2) in any and all formations below the base of the Marcellus Shale to the top of the formation commonly known as the Utica Shale, and (3) in all formations below the base of the Utica Shale.

{¶ 3} In 2017, Tera filed the underlying suit against appellants in the Belmont County Common Pleas Court.  Relevant here are Tera's bad-faith-trespass and conversion claims against appellants.  In support of those claims, Tera alleged that appellants had intentionally drilled six wells beneath Tera's property into the Point Pleasant formation, which it said falls outside of the Utica Shale formation and beyond the bounds of the mineral rights leased to appellants by Tera.

{¶ 4} The parties filed cross-motions for summary judgment on Tera's trespass and conversion claims.  The trial court awarded summary judgment to Tera on both claims.  In doing so, it stated that "it is undisputed that the Point Pleasant Formation is the geological formation immediately below the Utica Shale formation," and it concluded that the lease contained "clear and unequivocal words of limitation" that granted "rights solely to the Marcellus and Utica formations" and reserved "rights to all formations above and below those [formations]."  The trial court also stated, "Even construing the available evidence most strongly in favor of [appellants], they have not offered any sufficient evidence" to demonstrate that the lease granted them the right to take oil and gas from the Point Pleasant.

The trial court limited its summary-judgment decision to the question of appellants' liability for trespass and conversion, leaving the question of damages for trial.

{¶ 5} Prior to a trial on damages, both Tera and appellants moved for partial summary judgment on the question whether appellants' trespass had been in bad faith. The trial court granted summary judgment to Tera on that issue, concluding that appellants had "knowingly, willfully, and recklessly drilled their wells into the Point Pleasant." This conclusion was primarily based on the trial court's finding that the lease language "could not be any clearer—the lease was limited to just the Marcellus Shale and Utica Shale, and the Point Pleasant Formation was not conveyed or leased" and that appellants' interpretation of the lease was therefore unreasonable. Based on its determination that appellants had trespassed in bad faith, the trial court stated that "the damages owed to [Tera were] to be calculated without any deduction for the cost of drilling, operating, transporting, and any other expense incurred in removing the oil and gas from [Tera's] property." A jury trial proceeded on the issue of damages, and the jury found that Tera was entitled to net damages in the amount of $40,129,357.62.

{¶ 6} The Seventh District affirmed. 2023-Ohio-273, 205 N.E.3d 1168, ¶ 52. In a split decision, it concluded that the lease language at issue was unambiguous, *id.* at ¶ 49-51, and that the phrase "Utica Shale" had a "technical stratigraphic meaning," *id.* at ¶ 50. Its reasoning was similar to that of the trial court:

It is undisputed that the Point Pleasant is a formation below the Utica Shale. Consequently, we find that Shaw unambiguously reserved the Point Pleasant formation from the lease. To the extent that ambiguity exists with the "grant of lease" provision, we conclude that it is clarified by the plain language of the reservation section.

4

Finally, insofar as the contract language is unambiguous, we need
not consider any parol evidence.

*Id.* at ¶ 51. The dissenting judge concluded that "[t]he plain language of the lease clearly granted [appellants] rights in the Point Pleasant formation after employing extrinsic evidence on the specialized meaning of certain terminology used in the lease." *Id.* at ¶ 136 (Robb, J., dissenting).

{¶ 7} This court accepted appellants' discretionary appeal on the following propositions of law:

1. Gas leases are no exception to this court's precedents requiring that courts consider evidence of common meaning.

2. "Bad faith" trespass in energy cases—as in other cases—turns on subjective intent.

*See* 170 Ohio St.3d 1441, 2023-Ohio-1830, 210 N.E.3d 545.

**Analysis**

{¶ 8} Under their first proposition of law, appellants ask this court to interpret the phrase "the formation commonly known as the Utica Shale" in the lease according to its common meaning, which, appellants argue, includes the Point Pleasant.[2] Appellants assert that we should reverse the court of appeals' judgment and enter summary judgment in their favor or, in the alternative, remand the case to the trial court so that a jury can determine the meaning of the lease.

---

2. In the parties' briefs here and in the decisions of the trial court and the court of appeals below, the Point Pleasant is also referred to as the "Point Pleasant Formation" or "Point Pleasant formation." This court's use of any particular phrase in that regard is only to describe the arguments presented and is not meant to accord any significance to a particular phrase.

**{¶ 9}** Tera argues in response that the trial court and the court of appeals correctly concluded that the lease is unambiguous because the technical, geological meaning of the phrase "Utica Shale" excludes the Point Pleasant formation. Accordingly, Tera argues that this court should affirm the court of appeals' judgment.

**{¶ 10}** The issues in this appeal were decided below on summary judgment. Appellate review of summary-judgment decisions is de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Under Civ.R. 56(C), summary judgment may be granted if it is determined that:

> (1) No genuine issue as to any material fact remains to be litigated;
> (2) the moving party is entitled to judgment as a matter of law; and
> (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.

*Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977).

**{¶ 11}** Oil and gas leases are contracts and are subject to the traditional rules of contract interpretation. *Lutz v. Chesapeake Appalachia, L.L.C.*, 148 Ohio St.3d 524, 2016-Ohio-7549, 71 N.E.3d 1010, ¶ 11; *see also Harris v. Ohio Oil Co.*, 57 Ohio St. 118, 129, 48 N.E. 502 (1897). We have explained:

> When confronted with an issue of contract interpretation, our role is to give effect to the intent of the parties. We will examine the contract as a whole and presume that the intent of the parties is reflected in the language of the contract. In addition, we will look

6

to the plain and ordinary meaning of the language used in the contract unless another meaning is clearly apparent from the contents of the agreement. When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties.

*Sunoco, Inc. (R&M) v. Toledo Edison Co.*, 129 Ohio St.3d 397, 2011-Ohio-2720, 953 N.E.2d 285, ¶ 37. " 'As a matter of law, a contract is unambiguous if it can be given a definite legal meaning.' " *Id.*, quoting *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 11.

{¶ 12} "Extrinsic evidence is admissible to ascertain the intent of the parties when the contract is unclear or ambiguous, or when circumstances surrounding the agreement give the plain language special meaning." *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 313-314, 667 N.E.2d 949 (1996). " 'If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined.' " *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 108, 652 N.E.2d 684 (1995), quoting *Inland Refuse Transfer Co. v. Browning-Ferris Industries of Ohio, Inc.*, 15 Ohio St.3d 321, 322, 474 N.E.2d 271 (1984). But terms in a contract are ambiguous when they are susceptible to more than one reasonable interpretation. *See Motorists Mut. Ins. Co. v. Ironics, Inc.*, 168 Ohio St.3d 467, 2022-Ohio-841, 200 N.E.3d 149, ¶ 14. It is generally the role of the fact-finder to resolve any ambiguity in a contract. *Westfield Ins. Co.* at ¶ 13. In other words, whether a contract is ambiguous is a question of law, but the resolution of an ambiguous term in a contract is a question of fact. *McOmber v. Liebrecht*, 3d Dist. Van Wert No. 15-22-05, 2023-Ohio-2019, ¶ 29; *Atelier Dist., L.L.C. v. Parking Co. of Am., Inc.*, 10th Dist. Franklin No. 07AP-87, 2007-Ohio-7138, ¶ 17.

**{¶ 13}** In the lease at issue, the phrase "Point Pleasant" is not found within the four corners of the lease. The operative question, then, is whether the phrase "the formation[] commonly known as * * * the Utica Shale," as used in the lease to describe the mineral rights leased, can reasonably be read to include the Point Pleasant.

**{¶ 14}** The trial court found that the plain language of the lease clearly did not grant appellants the mineral rights for the Point Pleasant. To reach that conclusion, however, the trial court necessarily relied on evidence outside the four corners of the agreement to determine that the Point Pleasant was beneath the Utica Shale and thus was not part of "the formation[] commonly known as * * * the Utica Shale," because nothing in the agreement itself indicates that the Point Pleasant is not part of the formation commonly known as the Utica Shale. The trial court stated that "it is undisputed that the Point Pleasant Formation is the geological formation immediately below the Utica Shale formation," and it determined that the reservation clause in the lease—which reserved to Tera the mineral rights "in all formations below the base of the Utica Shale"—demonstrated the parties' intent to limit the mineral rights granted to appellants under the lease to only those for the Marcellus Shale and Utica Shale formations. But the stratigraphic location of the Point Pleasant—meaning its geologic location within the layers of rock or sediment—as understood by the parties today does not answer the question whether the Point Pleasant was considered part of the formation commonly known as the Utica Shale when the parties entered into the lease. And because the lease does not expressly refer to the Point Pleasant, its plain language does not answer the question whether the Point Pleasant was meant by the parties to be included in what they referred to as "the[] formation commonly known as * * * the Utica Shale." Without language in the lease specifically demonstrating the parties' understanding of the stratigraphic location of the Point Pleasant or whether they intended for the Utica Shale to include the Point Pleasant, the lease itself offers no guidance on the

8

question whether the parties had agreed that the Point Pleasant was part of the Utica Shale.

{¶ 15} Moreover, in finding that the parties to the lease did not intend for it to grant appellants the right to take oil and gas from the Point Pleasant, the trial court stated that "[e]ven construing the available evidence most strongly in favor of [appellants], [appellants] have not offered any sufficient evidence to the contrary." This language suggests that the court did consider and weigh evidence outside the lease in reaching its conclusion. Even if the trial court merely considered "the available evidence" in an effort to understand a technical term, it appears that it nonetheless conducted fact-finding rather than simply determining, for purposes of summary judgment, whether a disputed fact existed. That is not a permissible action by a trial court at the summary-judgment stage. *See Dupler v. Mansfield Journal Co., Inc.*, 64 Ohio St.2d 116, 121, 413 N.E.2d 1187 (1980) (noting that a court considering summary judgment "may not weigh the proof or choose among reasonable inferences"); *see also Marshall v. Colonial Ins. Co.*, 7th Dist. Mahoning No. 15 MA 0169, 2016-Ohio-8155, ¶ 48; *Telecom Acquisition Corp. I, Inc. v. Lucic Ents., Inc.*, 2016-Ohio-1466, 62 N.E.3d 1034, ¶ 93 (8th Dist.); *Finn v. Nationwide Agribusiness Ins. Co.*, 3d Dist. Allen No. 1-02-80, 2003-Ohio-4233, ¶ 7.

{¶ 16} The court of appeals agreed with the trial court that the lease language was unambiguous. It concluded that the words "commonly known as" within the phrase "the formation[] commonly known as * * * the Utica Shale" were intended to "simply memorialize[] the rule of contract interpretation that obliges a court to rely on the common meaning of words, unless doing so would cause an absurd result," 2023-Ohio-273, 205 N.E.3d 1168, at ¶ 50. The court of appeals also concluded that if the phrase "commonly known as" created any ambiguity in the lease, the meaning was clarified by the lease's reservation clause. *Id.* at ¶ 51.

Therefore, the court concluded, it was not necessary to consider any parol evidence. *Id.*

{¶ 17} Again, neither the grant clause nor the reservation clause of the lease expressly mentions the Point Pleasant. Nor does the lease language answer the question whether the parties intended for the Point Pleasant to be considered part of the Utica Shale when the lease was executed. Even if we were to accept the court of appeals' determination that the phrase "commonly known as" was simply meant to "memorialize" a contract-interpretation principle, we would still have to look outside the four corners of the lease to determine whether the common meaning of the phrase "the formation[] commonly known as * * * the Utica Shale" included the Point Pleasant. In other words, were the lower courts relying on the *common meaning* or the technical, stratigraphic meaning of "Utica Shale"? Or could the lower courts say, with certainty and without turning to extrinsic evidence, that the *common meaning* of the phrase "Utica Shale" when the parties entered into the lease was the same as its technical, stratigraphic meaning? Because the answers to those questions remain unclear, we are not persuaded that the lease language clearly established that the Point Pleasant was or was not to be considered part of the Utica Shale.

{¶ 18} The judge dissenting from the court of appeals' decision asserted that extrinsic evidence was properly considered to construe a term within the lease—"Utica Shale"—that had a special meaning and that the evidence demonstrated that the special meaning of "Utica Shale" when the lease was entered into included the Point Pleasant. 2023-Ohio-273 at ¶ 136-141, 146 (Robb, J., dissenting). But Tera cites extrinsic evidence that it contends demonstrates the opposite conclusion. Thus, even when considering extrinsic evidence to understand the special, industry meaning of the phrase "Utica Shale" as it relates to the Point Pleasant, we cannot discern a clear legal meaning intended by the parties. All we can discern is that the lease is reasonably susceptible to different interpretations.

10

Because both interpretations are reasonable, we cannot give the phrase "Utica Shale" a definite legal meaning based on the lease language alone. Therefore, we conclude that the lease is ambiguous.

{¶ 19} Resolving the meaning of ambiguous terms in a contract is a matter of factual determination for the fact-finder. *See Davis v. Loopco Industries, Inc.*, 66 Ohio St.3d 64, 66, 609 N.E.2d 144 (1993). We have noted that "the purpose of summary judgment is 'not to try issues of fact, but rather to determine whether triable issues of fact exist.' " *Smathers v. Glass*, 172 Ohio St.3d 84, 2022-Ohio-4595, 222 N.E.3d 554, ¶ 3, quoting *Viock v. Stowe-Woodward Co.*, 13 Ohio App.3d 7, 15, 467 N.E.2d 1378 (6th Dist.1983). Rather than weighing the evidence, a court considering summary judgment must construe the evidence in favor of the nonmoving party, including when drawing inferences from facts or resolving factual ambiguities or inconsistencies. *See id.* at ¶ 32.

{¶ 20} Here, the parties' filings and arguments demonstrate that triable issues of fact remain regarding whether they intended for the Point Pleasant to be considered part of "the formation[] commonly known as * * * the Utica Shale" when they entered into the lease. As the court of appeals noted, both parties submitted multiple expert reports on that issue. 2023-Ohio-273, 205 N.E.3d 1168, at ¶ 48. Their briefs refer to conflicting evidence from numerous depositions and other sources on the topic, including evidence regarding what the parties negotiated and what they understood at the time they entered into the lease, how the Ohio Department of Natural Resources had referred to the geological formations in its publications and forms, and how the geologic formations had been referred to by members of the public and the news media and industry representatives. To determine from all of that information the definitive legal meaning that the parties intended by the lease language would require this court to step into the role of fact-finder and weigh the credibility of the witnesses and draw inferences from the evidence. But it is no more proper for this court to weigh evidence and the

11

credibility of witnesses to decide issues of fact at the summary-judgment stage than it is for a trial court to do so.[3] A jury may very well come to the same conclusion as Tera and the dissent about the meaning of the lease's terms, but that is precisely the role of the jury in a case involving disputed facts, and such disputes cannot be resolved on summary judgment. Because there remain genuine issues of material fact to be litigated, we are unable to conclude that either party is entitled to judgment as a matter of law. Accordingly, we reverse the judgment of the Seventh District and remand the case to the trial court for further proceedings.

{¶ 21} Appellants' second proposition of law concerns Tera's bad-faith-trespass claim and, more specifically, appellants' assertion that the trial court and the court of appeals improperly determined that appellants acted in bad faith based merely on the court's conclusion that the lease language did not grant appellants the mineral rights to the Point Pleasant formation beneath Tera's land. Although the court of appeals recognized that "[t]he question of good faith is an issue of ultimate fact as to whether or not there was bona fide belief of right in the action taken and complained of, to be arrived at by the trier of facts from all the relevant material evidence adduced in the case," *id*. at ¶ 55, citing *Bamer v. Tiger, Inc.*, 5th Dist. Muskingum No. CA-86-17, 1987 WL 11004 (May 8, 1987), it nonetheless concluded that based on its resolution of the lease language, "there [was] no set of facts by which [appellants] could demonstrate a good faith belief of right to drilling into and extracting minerals from the Point Pleasant," *id.* at ¶ 57. Because that conclusion depended on the court of appeals' judgment with respect to the lease language, which we reverse, we must also reverse the court of appeals' judgment

---

3. The dissent argues that everyone knows what the Point Pleasant formation is and where it lies and that it was clearly excluded from the lease. The dissent's confidence in determining that fact for the parties is inspiring. But the question here is not what the Point Pleasant is or how its location is defined today. The question is what did the parties to the lease intend by the phrase "the formations commonly known as the Marcellus Shale and the Utica Shale," without there being any mention in the lease of the Point Pleasant formation by name and, more importantly, whether that question should ultimately be determined by this court or by the fact-finder.

on appellants' second assignment of error below (which correlates to their second proposition of law here) and remand the case to the trial court for further proceedings on that issue.

## Conclusion

{¶ 22} For the foregoing reasons, we reverse the judgment of the Seventh District Court of Appeals affirming the trial court's grants of summary judgment to Tera, and we remand the case to the trial court.

Judgment reversed

and cause remanded.

FISCHER, DONNELLY, and EKLUND, JJ., concur.

DEWINE, J., dissents, with an opinion joined by KENNEDY, C.J., and DETERS, J.

JOHN J. EKLUND, J., of the Eleventh District Court of Appeals, sitting for BRUNNER, J.

_____

**DEWINE, J., dissenting.**

{¶ 23} This is a case about a lease that granted mineral rights to only a specific portion of a landowner's subsurface estate. By failing to construe the lease as a whole and by misapplying the summary judgment standard, the majority incorrectly concludes that the lease is ambiguous. It reverses the judgment of the courts below and remands the case for a jury to consider extrinsic evidence about the contract's meaning. I would not. Because the lease is unambiguous, I would uphold the trial court's grant of summary judgment in favor of the landowner.

### *The Lease Is Unambiguous*

{¶ 24} Thomas Shaw leased to Rice Drilling D, L.L.C., the mineral rights to a specific portion of his subsurface property. Shaw's remaining rights are now held by Tera, L.L.C., and Gulfport Energy Corporation now apparently holds a

portion of Rice Drilling's rights.  To keep things simple, I will refer to the opposing parties simply as the landowner and the drilling companies.

**{¶ 25}** The underlying question in this case is straightforward: Did the lease, by granting the drilling companies the right to drill into the geological formation known as the Utica Shale, also grant the drilling companies the right to drill into the geologically distinct Point Pleasant formation?

**{¶ 26}** There is no dispute about the locations of the respective geological formations.  The experts in this case agreed on the Utica Shale's basic geological meaning.  The Utica Shale is all the strata between the Kope and Point Pleasant formations.  The Seventh District Court of Appeals below noted that both sides also agree that as a matter of geology, the Point Pleasant formation lies below the base of the Utica Shale.  *See* 2023-Ohio-273, 205 N.E.3d 1168, ¶ 51.  And an expert for each side confirmed that the Ohio Department of Natural Resources identified the Utica Shale and the Point Pleasant formation as distinct formations at the time the lease was signed.

**{¶ 27}** The lease identified the parameters of the subsurface property leased to the drilling companies in two separate—but complementary—ways.  First, the granting clause defined the subsurface areas that were leased to the drilling companies.  And in a belt-and-suspenders approach, the reservation clause defined the subsurface areas that were not leased to the drilling companies but were instead retained by the landowner.  Both provisions make clear that the Point Pleasant formation was not part of the subsurface area granted to the drilling companies.

**{¶ 28}** In the granting clause, the landowner leased to the drilling companies mineral rights "in the formations commonly known as the Marcellus Shale and the Utica Shale."  And in the reservation clause, the landowner reserved for himself all rights not specifically granted to Rice Drilling in the lease and "all products contained in any formation: * * * (3) in all formations below the base of the Utica Shale."  Thus, the granting clause makes clear that the drilling companies

14

did not have rights to the Point Pleasant formation, because the formation is not part of the "Marcellus Shale and the Utica Shale."  The reservation clause makes this doubly clear: it reserves to the landowner all formations below the base of the Utica Shale, and the Point Pleasant formation is indisputably below the Utica Shale. A covenant-and-entireties clause reinforces this understanding, providing that "[the drilling companies] will utilize current and future technologies to * * * maximize production recovery of all the oil and gas resources contained in the *Marcellus Shale and Utica Shale * * **."  (Emphasis supplied.)

{¶ 29} The drilling companies' only response to this plain reading of the contract is to argue that the "commonly known as" modifier in the granting clause changes the plain meaning of the contract.  In their view, the phrase "commonly known as" demonstrates that the parties meant to reject the geological meaning of Utica Shale and instead adopt a colloquial meaning of the term.  In support of this argument, they rely on a handful of news articles and other anecdotal materials in which they contend that the term "Utica Shale" was sometimes loosely used in a manner that also included the Point Pleasant formation.  The landowner counters that when read as a whole, the contract is plain and unambiguous and that the phrase "commonly known as" was simply used to reflect that the Utica Shale has different names depending on the area of the country in which it is found.

{¶ 30} I don't find persuasive the drilling companies' argument that extrinsic evidence establishes that the parties intended to give a colloquial and imprecise meaning to the term "Utica Shale."  To start, extrinsic evidence is only admissible if a contract is ambiguous.  *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 313-314, 667 N.E.2d 949 (1996).  The first question, then, is whether the lease is ambiguous.  It is not.

{¶ 31} "One cannot really determine if a phrase is ambiguous on its own, because interpretation is contextual."  Caleb Nelson, *Statutory Interpretation* 101; *see also* Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 167

(2012) ("Context is a primary determinant of meaning"). And here, context weighs heavily against the drilling companies' argument. The idea that the parties intended a loose, colloquial meaning of Utica Shale does not square with the contract when read as a whole.

{¶ 32} Ordinarily, oil and gas contracts lease the rights to all subsurface geological formations. *See, e.g.*, *K & D Farms, Ltd. v. Enervest Operating, L.L.C.*, 5th Dist. Stark No. 2015CA00038, 2015-Ohio-4475, ¶ 29. But this lease was unusual. The landowner only leased the rights to specific portions of the subsurface area. Not surprisingly, then, the contract defines the areas that are the subjects of the lease with precise geological terms. The reservation clause, for example, reserves to the landowner "all products contained in *any formation*: (1) from *the surface* of the Leased Premises *to the top of the formation* commonly known as the Marcellus Shale, (2) in any and all formations *below the base* of the Marcellus Shale *to the top of the formation* commonly known as the Utica Shale, and (3) in all formations *below the base* of the Utica Shale." (Emphasis supplied.) Quite simply, the loose, colloquial meaning of Utica Shale proffered by the drilling companies is at odds with the highly specific language used to detail the precise geological contours of the parties' rights throughout the lease.

{¶ 33} The drilling companies might have a stronger argument if the lease simply granted them the rights to drill into the geological area "commonly known as the Utica Shale." But the words "the formation" precede the phrase "commonly known as." The plain and ordinary meaning of "formation" is "any igneous, sedimentary, or metamorphic rock represented as a unit in geological mapping." *Webster's Third New International Dictionary* 893 (1993). It was undisputed at the time the contract was signed—and remains undisputed today—that the Utica Shale and the Point Pleasant formation constitute two distinct formations. It would be illogical to say that the right to drill into "*the formation* commonly known as the Utica Shale" includes the right to drill into multiple formations.

{¶ 34} Also problematic for the drilling companies is the fact that under the reservation clause, the landowner reserved the rights to all products "in all formations below the base of the Utica Shale."  The "commonly known as" language is not included in this portion of the reservation clause.  Thus, to accept the drilling companies' argument requires one to assume either that the granting clause trumps the reservation clause, or that the clauses set forth inconsistent rights.  There is no textual basis for the first assumption.  And adopting the second assumption would mean that the landowner granted the drilling companies the right to drill into the Point Pleasant formation and at the same time reserved for himself all rights in the Point Pleasant formation—a nonsensical result.

{¶ 35} Finally, the lease suggests that the parties explicitly recognized a potential need for the landowner to drill through the Utica Shale to reach the Point Pleasant formation.  The reservation clause provides, "[Landowner] also reserves the right to drill through any leased shale(s) subject to [the drilling companies'] approval which shall not be unreasonably withheld * * *."  While not dispositive by itself, the inclusion of this language is another indication that the parties understood that the landowner was retaining rights to the formations—such as the Point Pleasant formation—that lie below the Utica Shale.

{¶ 36} In finding the lease ambiguous, the majority fixates on the phrase "commonly known as" to the exclusion of the rest of the contractual language.  But that's not the way that we read contracts.  *See Great Lakes Bar Control, Inc. v Testa*, 156 Ohio St.3d 199, 2018-Ohio-5207, 124 N.E.3d 803, ¶ 9 ("Evaluating the context in which a word is written is essential to a fair reading of the text"); *see also* Scalia & Garner, *Reading Law* at 56.  When the contract is read as a whole, there is no ambiguity.

{¶ 37} The majority misses this point.  It neglects to consider the contract as a whole and instead jumps to the conclusion that extrinsic evidence is required to understand the meaning that the parties ascribed to the terms of the contract.  But

where there is no ambiguity, a foray into extrinsic evidence is inappropriate. *Graham*, 76 Ohio St.3d at 313-314, 667 N.E.2d 949.

### *The Majority Misapplies the Summary Judgment Standard*

{¶ 38} Other than its laser focus on a single phrase, the majority does not seriously engage with the language of the contract in its determination of ambiguity. Instead, it concludes that the trial court was confronted with a question of fact for the jury because the lease fails to specifically reference the Point Pleasant formation. In so concluding, the majority states, "[T]he trial court necessarily relied on evidence outside the four corners of the agreement * * *, because nothing in the agreement itself indicates that the Point Pleasant is not part of the formation commonly known as the Utica Shale." Majority opinion, ¶ 14. And the majority reasons that "because the lease does not expressly refer to the Point Pleasant, its plain language does not answer the question whether the Point Pleasant was meant by the parties to be included in what they referred to as 'the[] formation commonly known as the * * * Utica Shale.' " (Brackets and ellipsis in original.) *Id.* at ¶ 14. The finding of ambiguity seems to rely wholly on the fact that it is necessary to look outside the four corners of the contract to understand that the Point Pleasant formation is not part of the Utica Shale.

{¶ 39} Such analysis is overly simplistic and misstates the proper role of a court in interpreting a contract for purposes of a motion for summary judgment. "The construction of written contracts and instruments of conveyance is a matter of law." *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146 (1978), paragraph one of the syllabus. "As a matter of law, a contract is unambiguous if it can be given a definite legal meaning." *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 11. It is only when a court determines that a contract is ambiguous that it is proper for a jury to consider extrinsic evidence of the parties' intent. *See Graham* at 313-314. But if the evidence is so clear and one-sided that no reasonable person would determine

the disputed issue in any way but one, the court is well within its authority to decide the question as a matter of law. 5 *Corbin on Contracts*, Section 24.30 (Rev.Ed.2018); *see also Buckeye Pipe Line* at 248.

{¶ 40} The majority rests its determination of ambiguity on the fact that it is necessary to look outside the four corners of the contract to understand that the Point Pleasant formation is not part of the Utica Shale. But that makes little sense. Imagine a contract that gave a party the right to distribute a product in Ohio. A judge in Ashtabula might not know that Wapakoneta is part of Ohio and might need to look at a map to determine that the contract included the right to distribute the product in Wapakoneta. But nobody would argue that because a judge had to look outside the four corners of a contract to ascertain the universally agreed-upon meaning of a term, the contract was ambiguous. Similarly, there should be no objection here to looking at widely agreed-upon geological definitions and stratigraphic maps to understand the geological terms in the lease.

{¶ 41} Indeed, it is commonly understood that a judge may consult dictionaries and other similar materials outside the four corners of a contract to determine the meaning of its terms. *See, e.g.*, *Buckeye Pipe Line* at 247-248 (relying on a dictionary to ascertain the meaning of undefined terms in an oil and gas lease); *see also In re Envirodyne Industries*, 29 F.3d 301, 305 (7th Cir.1994) ("Cases in which courts use [dictionaries and similar materials] to interpret contractual or statutory provisions are legion").

{¶ 42} The majority also accuses the trial court of improperly "consider[ing] and weigh[ing] evidence." Majority opinion at ¶ 15. As the basis for this claim, it points to the trial court's statement that "[e]ven construing the available evidence most strongly in favor of [the drilling companies], [they] have not offered any sufficient evidence to the contrary." But despite what the majority says, the trial court did exactly what it was supposed to do. When a trial court evaluates a motion for summary judgment, "the evidence must be construed most

strongly in favor of the nonmoving party." *Bliss v. Johns Manville*, 172 Ohio St.3d 367, 2022-Ohio-4366, 224 N.E.3d 22, ¶ 13. So what the majority complains about is simply a straightforward application of the summary judgment standard. The trial court's statement that the drilling companies had not offered sufficient evidence to the contrary did not constitute an improper weighing of the evidence but simply conveyed the court's assessment that the evidence presented was not sufficient to create a genuine issue of material fact for trial. Such an analysis is appropriate; indeed, it is required. *See* Civ.R. 56; *see also Buckeye Pipe Line*, 53 Ohio St.2d at 248, 374 N.E.2d 146 (trial court's interpreting a contract on summary judgment as a matter of law was proper when affidavit submitted by nonmoving party provided meanings of terms as used in oil and gas industry, and evidence was insufficient to raise a genuine issue of material fact).

{¶ 43} The trial court acted well within the proper standards for interpreting a contract as a question of law on a motion for summary judgment. The court examined the contract and determined its unambiguous language constituted "a grant of rights solely to the Marcellus and Utica formations." The court also noted that it was "undisputed that the Point Pleasant formation is the geological formation immediately below the Utica Shale formation." Thus, the court found that "by the plain language [of the contract], [the drilling companies] acquired no interest in the oil and/or gas in the Point Pleasant formation." The trial court didn't weigh the evidence—it applied the plain language of the contract to the undisputed evidence and concluded that the landowner was entitled to judgment as a matter of law.

{¶ 44} Thus, unlike the majority, I would affirm the judgment of the court of appeals upholding the trial court's grant of summary judgment in favor of the landowner on the contract issue.

### *Good-Faith Trespass*

{¶ 45} I also find no error in the trial court's grant of summary judgment on the issue of good-faith trespass. Under Ohio law, the act of trespass creates a

presumption of willfulness and places the burden on the trespasser to prove that he acted in good faith. *See Athens & Pomeroy Coal & Land Co. v. Tracy*, 22 Ohio App. 21, 31, 153 N.E. 240 (4th Dist.1925), *aff'd*, 115 Ohio St. 298, 152 N.E. 641 (1926); *see also Brady v. Stafford*, 115 Ohio St. 67, 152 N.E. 188 (1926). The drilling companies contend that the question whether one has trespassed in good faith is purely a subjective inquiry. But our caselaw is to the contrary. *See State ex rel. Ohio History Connection v. Moundbuilders Country Club Co.*, 171 Ohio St.3d 663, 2022-Ohio-4345, 220 N.E.3d 678, ¶ 32 (question of good faith or bad faith includes an objective standard that requires consideration of whether one acted reasonably under the circumstances in addition to considering whether one acted honestly*)*; *Brady v. Stafford*, 115 Ohio St. 67, 152 N.E. 188 (1926), paragraph four of the syllabus (good-faith trespass requires a bona fide belief that trespasser has a right to take minerals). The trial court properly found that in light of the unambiguous contract and the other materials submitted in support of summary judgment that the drilling companies did not have a reasonable claim of right to exploit the Point Pleasant formation.

### *Conclusion*

**{¶ 46}** The judgment of the court of appeals should be affirmed. Because the majority does otherwise, I respectfully dissent.

KENNEDY, C.J., and DETERS, J., concur in the foregoing opinion.

——————————

C.J. Wilson Law, L.L.C., and Craig J. Wilson; Law Office of Elizabeth L. Glick, and Elizabeth L. Glick; and Myser & Davies and Richard Myser, for appellee.

Steptoe & Johnson, P.L.L.C., John Kevin West, and John C. Ferrell, for appellants, Rice Drilling D, L.L.C., and Gulfport Energy Corporation.

Kirkland & Ellis, L.L.P., Ragan Naresh, Joseph C. Schroeder, and Kenneth A. Young, for appellant Rice Drilling D, L.L.C.

Kirkland & Ellis, L.L.P., and Daniel T. Donovan, for appellant Gulf Energy Corporation.

Shuman McCuskey Slicer, P.L.L.C., and Natalie C. Schaefer, urging affirmance for amicus curiae National Association of Royalty Owners—Ohio.

Roetzel & Andress, L.P.A., Emily K. Anglewicz, David J. Wigham, Timothy B. Pettorini, and Sara E. Fanning, urging affirmance for amici curiae Cardinal Minerals, L.L.C.; Portland Resources, L.L.C.; Ray Norris, individually and as trustee of the Ray Norris Trust U/A Dated March 11, 2014; and Janice K. Emrick, individually and as trustee of the June E. Norris Trust U/A Dated March 11, 2014.

Vorys, Sater, Seymour and Pease, L.L.P., Gregory D. Russell, Thomas H. Fusonie, and Christopher A. LaRocco, urging reversal for amicus curiae Ohio Oil and Gas Association.

Theisen Brock, L.P.A., and Daniel P. Corcoran, urging reversal for amicus curiae Southeastern Ohio Oil and Gas Association.

Tony Long, Ohio Chamber of Commerce, urging reversal for amicus curiae Ohio Chamber of Commerce.

Steptoe & Johnson, P.L.L.C., and Dallas F. Kratzer III, urging reversal for amicus curiae American Gas Association.

_____